HERBERT C. GENTRY ET AL. *v.*
CITY OF NORWALK ET AL.

PETERS, C. J., HEALEY, SHEA, DANNEHY and SANTANIELLO, Js.

Argued March 12—decision released July 2, 1985

*Frank W. Murphy,* for the appellants (plaintiffs).

*James V. Minor,* deputy corporation counsel, for the appellees (defendants city of Norwalk, Mary O. Keegan and Norwalk Historic District Study Group).

*James A. Fulton,* for the appellee (defendant First Taxing District of City of Norwalk).

*Thomas M. Conroy,* for the appellee (defendant Ulla A. Driscoll).

ARTHUR H. HEALEY, J. This action in which the plaintiffs sought injunctive and declaratory judgment relief was generated by efforts in 1981 to establish an historic district pursuant to Chapter 97a of the General Statutes in the defendant city of Norwalk. The plaintiffs opposed the creation of the proposed historic district.[1]

The proposed historic district, which was to be known as the Norwalk Green Historic District (district), encompassed thirteen parcels of land in the vicinity of the Norwalk Green.[2] One of these parcels, located at 7–9 Park Street, was occupied by the Park Towers Condominium (PTC), a sixty-seven unit condominium.[3] On

---

[1] There are three plaintiffs in this action. The plaintiff Herbert C. Gentry owns a parcel in the proposed historic district. The plaintiffs Dennis B. Ross and Graham Helmendach own another as tenants in common.

[2] One of the parcels is the Norwalk Green which is owned by the defendant first taxing district of the city of Norwalk (district). Although the district was allowed to intervene in this action, it was ineligible to vote on the matter of the establishment of the proposed historical district.

[3] The Park Towers Condominium is a modern four-story structure originally constructed as an apartment house in 1967 and later converted into a condominium on August 28, 1974.

January 27, 1981, the common council of the legislative body of Norwalk, after its receipt of the report of the Historic District Study Committee (study committee), voted to approve a resolution authorizing balloting for the establishment of the proposed district. On February 23, 1981, ballots were issued by the defendant Mary Keegan, town clerk of Norwalk, and March 23, 1981, was set as the deadline for submitting them. For that ballot the votes to be exercised were allotted as follows: each property owner of record was assigned one full vote except where joint ownership appeared of record, such joint owners were given a fractional vote. According to the record, each PTC condominium unit owner was given 1/67 of a full vote. When the ballots cast were counted, the statutorily required 75 percent affirmative vote[4] of the owners voting necessary to approve the establishment of the proposed district was not attained.

On May 27, 1981, the common council adopted a resolution authorizing the study committee to hold another

---

[4] "[General Statutes] Sec. 7-147b. . . . (i) If seventy-five per cent of all property owners voting cast votes in the affirmative, the legislative body of the municipality shall by majority vote take one of the following steps: (1) Accept the report of the committee and enact an ordinance or ordinances to create and provide for the operation of an historic district or districts in accordance with the provisions of this part; (2) reject the report of the committee, stating its reasons for such rejection; (3) return the report to the historic district study committee with such amendments and revisions thereto as it may deem advisable, for consideration by the committee. The committee shall submit an amended report to the legislative body within sixty-five days of such return. The committee need not hold a public hearing other than the one provided for in subsection (d) of this section, notwithstanding any changes in its report following such hearing, unless the legislative body has recommended a change in the boundaries of the proposed district or districts. The legislative body of the municipality need not authorize ballots of the owners within a proposed district or districts to be cast, other than the balloting provided for in subsection (g) of this section, notwithstanding any changes in the proposed ordinance following such balloting, unless the boundaries of the proposed district in which the owners' property is situated are changed."

public hearing for a new referendum at which each PTC unit owner was assigned one full vote. After a public hearing on August 20, 1981, the study committee recommended another balloting to the common council. That legislative body, at its meeting on September 8, 1981, directed that a new referendum be held on October 9, 1981, in accordance with its resolution of May 27, 1981, assigning sixty-seven votes, one to each of the PTC condominium owners.[5] In that referendum, the PTC unit owners who returned their ballots cast fifty-six full votes. After the ballots were counted, Keegan certified that the vote was sixty-two in favor of establishing the proposed district and five against.

After a trial on the merits, the trial court held that General Statutes § 7-147b (g)[6] required that each PTC unit owner was entitled to one full vote. Having so

---

[5] Prior to the October 9, 1981 referendum, the plaintiffs instituted this action seeking injunctive and declaratory judgment relief. Although the plaintiffs sought a preliminary injunction against this referendum, the trial court did not grant that relief but reserved decision pending a full trial on the merits. It did, however, order the defendant Norwalk town clerk, the defendant Mary Keegan, to count the ballots of the PTC unit owners separately from the ballots of the other property owners voting.

On October 9, 1981, the Norwalk town clerk tallied the ballots as follows:

A. Votes of property owners exclusive of Park Towers condominiums: 6 yes; 5 no.

B. Votes of Park Towers condominium unit owners: 56 yes; 0 no.

[6] General Statutes § 7-147b is entitled "Procedure for establishment of historic district." Subsection (g) of that statute provides: "The legislative body shall, not later than sixty-five days from receipt of such report, authorize the clerk of the municipality, or his designee, to mail ballots to each owner of record of real property to be included in the proposed district or districts on the question of creation of an historic district or districts, as provided for in sections 7-147a to 7-147k, inclusive. Only an owner who is eighteen years of age or older and who is liable, or whose predecessors in title were liable, to the municipality for taxes on an assessment of not less than one thousand dollars on the last-completed grand list of the municipality on real property within the proposed district, or who would be or would have been so liable if not entitled to an exemption under subdivision (7), (8), (10), (11), (13), (14), (15), (16), (17), (20), (21), (22), (23), (24), (25),

declared, it denied the plaintiffs any injunctive relief. Thus, the necessary 75 percent approval for the establishment of the proposed district was obtained and the historic district was thereafter established. The plaintiffs appealed.

On appeal, the plaintiffs claim that the trial court erred in: (1) determining that each owner of a condominium unit was entitled to one full vote in the historic district referendum; and (2) refusing to enjoin the defendant Norwalk town clerk from certifying the ballots cast in the October 9, 1981 historic district referendum. We find error.

On appeal, the plaintiffs argue that, with regard to allocation of voting rights for the purpose of the establishment of the proposed historic district, a consistent reading and interpretation of the historic district statutes, particularly § 7-147b, and of the condominium statute, requires the conclusion that each unit owner in PTC be allocated 1/67 of a vote. In looking to the condominium statutes, they argue that their "common thread" is "to define the real property interest of the condominium unit owner, as the unit itself, which is clearly part of a building, and 'an undivided interest in the common elements specified' " and that, therefore, "it is clear that the ownership of each condominium unit owner in the real property, is the same as the ownership of a tenant in common, in that in addition to the unit the persons' [sic] ownership includes 'an undivided interest in the common elements speci-

_____

(26), (29) or (49) of section 12-81, may vote, provided such owner is the record owner of the property, thirty days before the ballots must be returned. Any tenant in common of any freehold interest in any land shall have a vote equal to the fraction of his ownership in said interest. Joint tenants of any freehold interest in any land shall vote as if each joint tenant owned an equal, fractional share of such land. A corporation shall have its vote cast by the chief executive officer of such corporation or his designee. No owner shall have more than one vote."

fied.' "[7] The statutory scheme, they claim, clearly shows an intent to limit each parcel of land to one full vote regardless of size, value or improvements. The council's second resolution, in effect, established two separate voting classifications of tenants in common, they argue, "one for condominium unit owners, and one for everyone else." Giving each unit owner one full vote makes the statutory scheme "irrational" because, they continue, the statutory scheme "is to give each property one vote, divided into its various proportionate shares depending upon the nature of the ownership." Because the council's May 27, 1981 resolution did not follow this "one parcel, one vote" interpretation of the plaintiffs, the council, they claim, directed "an illegal method of voting, which should be declared invalid and permanently enjoined."

On the other hand, the defendants argue that allocating a full vote to each condominium unit owner is not only directed by the plain language of § 7-147b (g) of the historic district statute, but also "is consistent with the legislative intent to award the voting franchise to real property taxpayers." That statute does not, they claim, grant a fractional vote to a tenant in common in land but rather grants a fractional vote to a "tenant in common of any freehold interest" in land, and the statute thus illuminates the fallacy of the plaintiffs' claim that the " 'entire parcel' " at 7–9 Park "is *a* freehold interest." (Emphasis added.) Rather, the defendants maintain that there are sixty-seven separate freeholds at 7–9 Park Street because each unit and its undivided interest in the common elements may be conveyed by "an indefeasible title in fee simple absolute," citing General Statutes § 47-72. Therefore, because " 'property is a creature and creation of the law' " there are, say the defendants, "67 freeholds now

---

[7] The plaintiffs maintain that this position is confirmed by the "Declaration and Bylaws of Park Towers Condominiums."

located at 7–9 Park Street, not one, and each unit owner possesses his freehold outright, not in common with his fellow unit owners."

Over 200 years ago, Lord Mansfield said: "As the usages of society alter, the law must adapt itself to the various situations of mankind." *Barwell* v. *Brooks,* 3 Doug. 371, 373 (1784). This venerable aphorism is appropriate in the resolution of the issues in this appeal. In considering the nature of a condominium unit owner's interests as it relates to a vote on the establishment of an historic district in which the condominium is located, we keep in mind that, although both relevant statutes are relatively recent in our jurisprudence, each one contains centuries old terms. Some of these terms, tenant in common, freehold interest, joint tenant, property and improvements have been defined by these statutes, while others presumably retain their common law meanings. The historic district statutes; General Statutes §§ 7-147a through 7-147k; were first enacted in this state in 1961, and the condominium act; General Statutes §§ 47-68a through 47-90c; was enacted in 1963.

Over the past fifty years all fifty states and hundreds of municipalities have enacted laws to encourage or require the preservation of buildings and areas with historic or aesthetic importance. *Penn Central Transportation Co.* v. *New York,* 438 U.S. 104, 107, 98 S. Ct. 2646, 57 L. Ed. 2d 631, reh. denied, 439 U.S. 883, 99 S. Ct. 226, 58 L. Ed. 2d 198 (1978). Such legislation has been precipitated by two concerns: first, "in recent years, large numbers of historic structures, landmarks and areas have been destroyed without adequate consideration of either the values represented therein or the possibility of preserving the destroyed properties for use in economically productive ways"; and, second, "a widely shared belief that structures with special historic, cultural, or architectural significance enhance

the quality of life for all." Id., 108; see *Maher* v. *New Orleans,* 516 F.2d 1051 (5th Cir. 1975), cert. denied, 426 U.S. 905, 96 S. Ct. 2225, 48 L. Ed. 2d 830 (1976); *Figarsky* v. *Historic District Commission,* 171 Conn. 198, 368 A.2d 163 (1976); 2 Anderson, American Law of Zoning (2d Ed. 1976) §§ 9.68 through 9.75. In upholding New York City's landmarks preservation law in *Penn Central,* the United States Supreme Court stated that "[l]egislation designed to promote the general welfare commonly burdens some more than others." *Penn Central Transportation Co.* v. *New York,* supra, 133.

In its statutory context the condominium is of relatively recent origin[8] offering, as it does, a means of shelter affording some of the benefits of property ownership without some of its burdens. The defendants in this case recognize that condominium ownership interests are "unique," and the plaintiffs concede that these interests "do not fall neatly within any of the categories" stated in the historic district voting provision. See General Statutes § 7-147b (g). This fairly sets the tone. The intermixture of the historic district and condominium statutes on this specific issue of vote allocation generates relevant considerations which, on analysis, do not precisely mesh or accurately fit any analytical mold. Given the argued tension between these two statutes, our construction, which involves seeking legislative purpose, strives for the application of common sense to achieve a sensible result in this case. See, e.g., *Aaron* v. *Conservation Commission,* 183 Conn. 532, 548, 441 A.2d 30 (1981); *State* v. *Bello,* 133 Conn. 600, 604, 53 A.2d 381 (1947); *Rawson* v. *State,* 19 Conn. 292, 299 (1848).

---

[8] Although the condominium has been regarded as innovative by some, Professor Berger points out that the concept has existed for centuries. Berger, "Condominium Shelter on a Statutory Foundation," 63 Col. L. Rev. 987 (1963).

Section 7-147b (g) does not specifically mention condominiums, but the plaintiffs appear to concede that under § 47-73 each condominium unit owner has a "real property interest"[9] which would qualify such an owner to cast "a fractional vote." We agree that each condominium owner is entitled to a fractional vote in the referendum permitted under § 7-147b. Section 47-73 in the condominium act provides that "[e]ach unit, together with its undivided interest in the common elements, shall for all purposes constitute real property." Section 7-147b (g) requires the municipal clerk to mail ballots for such a referendum to "each owner of record of real property . . . in the proposed district . . . ."[10] This statute also states that "[a]ny tenant in common of any freehold interest in any land shall have a vote equal to the fraction of his ownership in said interest. Joint tenants of any freehold interest in any land shall vote as if each joint tenant owned an equal, fractional share of such land. . . . No owner shall have more than one vote." The terms "tenant in common" and "freehold interest in any land" in § 7-147b (g) are key in the dispute between the parties. We are urged, inter alia, to attach to such terms definitions and attributes premised on common law origin and evolution that do not fit perfectly into the argued tension between the two recent statutes in resolving the quality of the vote to be given PTC unit owners of record. This lack of a neat coalescence rests in the main on these two statutes, each of which could be said to be sui generis, on the unprecedented nature of the issue as it is presented to us, and on certain language

[9] The defendants point out that the condominium units are "separately identified" on the grand list and unit owners are made liable for real property taxes.

[10] Such an owner must also be "eighteen years of age or older . . ." and must be liable "to the municipality for taxes on an assessment of not less than one thousand dollars on the last-completed grand list of the municipality on real property within the proposed district . . . ." General Statutes § 7-147b (g)

in each of the statutes, some defined and some not. One thing is, however, clear—our resolution must be guided by the intent of the legislature in enacting the historic district statute, and particularly § 7-147b (g).

Such terms as "tenants in common," "freehold interest" and "joint tenancy" have long been in the common law, and it is argued by the defendants that such terms and definitions when applied to § 7-147b (g) require that one full vote be given to each condominium unit owner.[11] We do not agree. The common law, of course, must change as circumstances change; see *State v. Muolo,* 118 Conn. 373, 378, 172 A. 875 (1934); and it "must be rational and compatible with present society if it is to be respected and upheld." (Citations omitted.) *Roth v. Bell,* 24 Wash. App. 92, 100, 600 P.2d 602 (1979). "In applying the common law to an unprecedented situation, [the court] may properly inquire whether the traditional rule is suited to present conditions." *Secretary of the Commonwealth v. City Clerk of Lowell,* 373 Mass. 178, 185, 366 N.E.2d 717 (1977); see *Nantucket Conservation Foundation, Inc. v. Russell Management,* 380 Mass. 212, 219, 402 N.E.2d 501 (1980). "It is true that technical common law words when used in a statute without definition will generally be construed in that sense unless a contrary intention appears from the context." (Citations omitted.) *Jones v. Magruder,* 42 F. Sup. 193, 197 (D. Md. 1941). As the *Jones* court said in ascertaining the congres-

---

[11] The defendants in these claims hone in on the Restatement of Property (1936), particularly with respect to "freehold interests." The Restatement, of course, was propounded long before either the condominium act or the historic district statutes were enacted and defendants have not referred us to any language that even suggests that work considered the concepts laid out in either statute. The Restatement of Property (1936) does, as the defendants point out, provide that there are five types of freehold interests: "(1) Estate in fee simple, (2) Estate in fee simple absolute, (3) Estate in fee simple defeasible, (4) Estate in fee simple conditional and estate in fee tail, and (5) Estate for life. RESTATEMENT OF PROPERTY, §§ 8, 14-18 (1936)."

sional intent underlying the phrase "land, tenements or other realty" in a taxing statute: "It is, however, not probable that Congress intended . . . to use the phrase 'lands, tenements, or other realty' in the technical nicety of the common law with respect to interests in lands flowing from a system of feudal tenure which did not exist in this country after the American Revolution." Id., 198. Therefore, sedulous adherence to every common law attribute is not called for here when we are dealing with interests "in any freehold interest in any land" flowing from ownership of a condominium unit where the condominium was unknown in our common law until created recently by statute. Legislative intent is not to be found in an isolated sentence; the whole statute must be considered. *Harris Data Communications, Inc.* v. *Heffernan,* 183 Conn. 194, 197, 438 A.2d 1178 (1981); *West Haven* v. *Impact,* 174 Conn. 160, 164, 384 A.2d 353 (1978). In ascertaining legislative intent, we may look to the history of the statute, the policy underlying it and the circumstances which brought about its enactment. *Lee* v. *Lee,* 145 Conn. 355, 358, 143 A.2d 154 (1958); *State* v. *Cambria,* 137 Conn. 604, 606, 80 A.2d 516 (1951). In construing a statute, common sense must be used and we must assume that the legislature intended to accomplish a reasonable and rational result. *State* v. *Roque,* 190 Conn. 143, 151, 460 A.2d 26 (1983); *Stoni* v. *Wasicki,* 179 Conn. 372, 376–77, 426 A.2d 774 (1979). A statute, of course, is not to be interpreted to thwart its purpose. *Mystic Marinelife Aquarium, Inc.* v. *Gill,* 175 Conn. 483, 489, 400 A.2d 726 (1978). As Judge Learned Hand said in *Borella* v. *Borden Co.,* 145 F.2d 63, 64 (2d Cir. 1944), aff'd, 325 U.S. 679, 65 S. Ct. 1223, 89 L. Ed. 1865 (1945): "We can best reach the meaning here, as always, by recourse to the underlying purpose, and, with that as a guide, by trying to project upon the specific occasion how we think persons, actuated by

such a purpose, would have dealt with it, if it had been presented to them at the time."

In ascertaining the nature of the vote to which PTC unit owners are entitled, it is important to recognize that the historic district statute in Chapter 97a of the General Statutes[12] focuses not on people but on "buildings, structures, places or surroundings" that are of "historical significance and architectural merit." See, e.g., General Statutes §§ 7-147a, 7-147d through 7-147g. The statute can fairly be denominated as "site" oriented and permits a municipality, through following certain procedures, to establish an historic district. The purpose of such a district is "to promote the educational, cultural, economic and general welfare of the public through the preservation and protection of the distinctive characteristics of buildings and places associated with the history of or indicative of a period or style of architecture of the municipality, of the state or of the nation." General Statutes § 7-147a (b). The statute, consistent with its historic preservation purpose, provides the bases for close control and supervision of the buildings and areas in established historic districts. An enforcement procedure, including monetary fines, is set forth for violations of the statute, of any action or ruling of an historic district commission or of any regulation or ordinance properly adopted. See General Statutes § 7-147h; see also 2 Rohan, Zoning and Land Use Controls (1984) § 7.02. State legislation authorizing the adoption of a local historic district ordinance is the usual vehicle for accomplishing these purposes. See, e.g., *Penn Central Transportation Co.* v. *New York,* supra; *Berman* v. *Parker,* 348 U.S. 26, 75 S. Ct. 98, 99 L. Ed. 27 (1959); *Maher* v. *New*

---

[12] Chapter 97a of the General Statutes is entitled "Historic Districts and Historic Properties." Part I of that section, which includes § 7-147b (g) is entitled "Historic Districts" and Part II is entitled "Historic Properties." See *New York, N.H. & H. R. Co.* v. *Orange,* 91 Conn. 472, 479, 100 A. 25 (1917).

*Orleans,* 371 F. Sup. 653 (E.D. La. 1974), aff'd, 516 F.2d 1051 (5th Cir. 1975), cert. denied, 426 U.S. 905, 96 S. Ct. 2225, 48 L. Ed. 2d 830 (1976); *Opinion of the Justices,* 333 Mass. 773, 128 N.E.2d 557 (1955); *Sante Fe* v. *Gamble-Skogmo, Inc.,* 73 N.M. 410, 389 P.2d 13 (1964); 2 Anderson, American Law of Zoning (2d Ed. 1976) §§ 9.69 through 9.70; 82 Am. Jur. 2d, Zoning and Planning § 40 (1976); note, "Land Use Controls in Historic Areas," 44 Notre Dame Law. 379 (1969); Brenneman, "Historic Preservation Restrictions: A Sampling of State Statutes," 8 Conn. L. Rev. 231 (1976).

We must look to the site orientation of an historic district, with its strong preservation mission, for guidance on the problem of who should vote on the question of the establishment of such a district. The thoughtful and comprehensive statutory scheme evidenced on the historic district does, as we have pointed out, subject owners of record of real property within such a district to close controls over use of their property. An historic district ordinance is, in practical effect, in the nature of a zoning ordinance. We note that while the historic district statute predated the condominium act, the former statute was substantially amended in 1980 by Public Acts 1980, No. 80-314. That 1980 amendment introduced that portion of § 7-147b (g) we have before us.[13] We deem it no oversight that that comprehensive amendment does not at all refer to condominiums in any respect.

---

[13] Public Acts 1980, No. 80-314, now codified as General Statutes § 7-147b, made significant amendment to the then-existing historic district statute. Subsection (g) of that public act, now General Statutes § 7-147b (g), was amended as follows: "(g) The legislative body [after reviewing the report of the historic district study committee] shall, NOT LATER THAN SIXTY-FIVE DAYS FROM RECEIPT OF SUCH REPORT, [cause] AUTHORIZE THE CLERK OF THE MUNICIPALITY, OR HIS DESIGNEE, TO MAIL ballots to [be taken of the owners] EACH OWNER of record of [all] real property to be included in the proposed district OR DISTRICTS on the question of [the adoption of an historic district ordinance and, if seventy-five per cent of all such owners voting thereon vote affirmatively by such bal-

It is an accepted tenet of statutory construction that "[t]he General Assembly is always presumed to know all the existing statutes and the effect that its action or non-action will have upon any one of them. And it is always presumed to have intended that effect which its action or non-action produces." (Citations omitted.) *New Haven Water Co.* v. *North Branford,* 174 Conn. 556, 565, 392 A.2d 456 (1978). A closer examination of the statutory schemes discloses that the application of common sense in endeavoring to illuminate the legislative intent to bring about a rational result does just that.

Although "unit" is generally defined in the definitional section of the condominium act in § 47-68a, the

lots, shall take one of the following steps: (1) Reject the report of the committee, stating its reasons therefor; (2) accept the report of the committee and enact an ordinance, to carry out the provisions of sections 7-147a to 7-147k, inclusive; (3) return the report to the historic district study committee with such amendments and revisions thereto as it may deem advisable, for consideration by the committee and a further report to the legislative body within ninety days of such return.] CREATION OF AN HISTORIC DISTRICT OR DISTRICTS, AS PROVIDED FOR IN THIS ACT, ONLY AN OWNER WHO IS EIGHTEEN YEARS OF AGE OR OLDER AND WHO IS LIABLE, OR WHOSE PREDECESSORS IN TITLE WERE LIABLE, TO THE MUNICIPALITY FOR TAXES ON AN ASSESSMENT OF NOT LESS THAN ONE THOUSAND DOLLARS ON THE LAST COMPLETED GRAND LIST OF THE MUNICIPALITY ON REAL PROPERTY WITHIN THE PROPOSED DISTRICT, OR WHO WOULD BE OR WOULD HAVE BEEN SO LIABLE IF NOT ENTITLED TO AN EXEMPTION UNDER SUBDIVISION (7), (8), (10), (11), (13), (14), (15), (16), (17), (20), (21), (22), (23), (24), (25), (26), (29) OR (49) OF SECTION 12-81, MAY VOTE, PROVIDED SUCH OWNER IS THE RECORD OWNER OF THE PROPERTY THIRTY DAYS BEFORE THE BALLOTS MUST BE RETURNED. ANY TENANT IN COMMON OF ANY FREEHOLD INTEREST IN ANY LAND SHALL HAVE A VOTE EQUAL TO THE FRACTION OF HIS OWNERSHIP IN SAID INTEREST. JOINT TENANTS OF ANY FREEHOLD INTEREST IN ANY LAND SHALL VOTE AS IF EACH JOINT TENANT OWNED AN EQUAL, FRACTIONAL SHARE OF SUCH LAND. A CORPORATION SHALL HAVE ITS VOTE CAST BY THE CHIEF EXECUTIVE OFFICER OF SUCH CORPORATION OR HIS DESIGNEE. NO OWNER SHALL HAVE MORE THAN ONE VOTE."

nexus between that statute and the voting provisions of the historic district statute is found in § 47-73 of the condominium statute.[14] Section 47-73 provides that "[e]ach unit, together with its undivided interest in the common elements, shall for all purposes constitute *real property.*" (Emphasis added.)[15] As we pointed out earlier, it was "each owner of record of *real property*" to whom ballots are to be sent under § 7-147b (g). (Emphasis added.)

The language in § 7-147b (g) which provides that "[a]ny tenant in common of any freehold interest in any land shall have a vote equal to the fraction of his ownership in said interest," the defendants argue, should be interpreted to mean that each PTC unit owner is entitled to one full vote. This is so, they argue, because

[14] The Condominium Act includes the following definitions in General Statutes § 47-68a: "(a) 'Condominium' means real property and any incidents thereto and interest therein, lawfully submitted to this chapter by the recordation of condominium instruments pursuant to the provisions of this chapter.

"(b) 'Unit' means a part of the property including one or more rooms or designated spaces located on one or more floors or a part or parts thereof in a building, intended for any type of independent use, and with a direct exit to a public street or highway or to common elements leading to such street or highway.

"(c) 'Unit owner' means the person or persons owning a condominium unit or leasing a unit in a leasehold condominium, as hereinafter provided, and an undivided interest in the common elements specified and established in the declaration and the heirs, executors, administrators, successors and assigns of such person or persons, and a mortgagee or lienholder holding both legal and equitable title.

"(e) 'Common elements' means all portions of the condominium other than the units.

"(*l*) 'Property' means and includes the land, all buildings, all improvements and structures thereon, and all easements, rights and appurtenances belonging thereto, which have been or are intended to be submitted to the provisions of this chapter."

[15] We recognize that it is a proper exercise of the legislative function to define the words contained in a statute. See *Neptune Park Assn.* v. *Steinberg,* 138 Conn. 357, 362, 84 A.2d 687 (1951); 1A Sands, Sutherland Statutory Construction (4th Ed. 1972) § 20.08; but cf. *United Interchange, Inc.* v. *Spellacy,* 144 Conn. 647, 654–55, 136 A.2d 801 (1957).

there are sixty-seven separate freeholds at PTC and each unit and its undivided interest in the common elements may be conveyed by "an indefeasible title in fee simple absolute" under General Statutes § 47-73.[16] They maintain that 7–9 Park Street contains not one but sixty-seven separate freeholds "and each unit owner possesses his freehold outright, not in common with his fellow unit owners." In countering the plaintiffs' argument that each PTC unit owner has "an undivided ownership interest in the entire parcel of real estate . . ." (at 7–9 Park Street), the defendants say that the plaintiffs "have overlooked the fact that . . . § 7-147b (g) does not grant a fractional vote to a tenant in common in land; it grants a fractional vote to a 'tenant in common of any *freehold interest*' in land." (Emphasis in original.) We agree with the plaintiffs' claim that each PTC unit owner is entitled to 1/67 of a full vote under § 7-147b (g).

The use of the terms "tenant in common" and "joint tenant," in § 7-147b (g) is a legislative recognition of the manner in which title could be held by those "owner[s] of record of real property" to whom the right to vote was given by statute. The tenancy in common (as also with joint tenants) had to be of "any freehold interest in any land." General Statutes § 7-147b (g). The noun "interest" here refers to an "interest" in "land." In this context, the noun "interest" is a word denoting "a legal relation or relations." See 1 Restatement, Property § 5, p. 11. The term "freehold" is an estate in fee or for life;[17] Black's Law Dictionary (5th

---

[16] For purposes of this case, it is sufficient to say that General Statutes § 47-72 in providing that a conveyance from a "declarant" to a purchaser of a "unit" shall be "by warranty deed or lease, conveying to the purchaser of such unit an indefeasible title in fee simple absolute or leasehold estate to the unit *and* to the percentage of undivided interest in the common elements appertaining to the unit. . ." (emphasis added) refers to the quality of the estate that the grantee receives.

[17] See footnote 11, supra.

Ed. 1979); and here it is used as an adjective that modifies the noun "interest," thus defining the nature of the "interest." The "freehold interest" is "in *any* land." (Emphasis added.) General Statutes § 7-147b (g). Unlike "real property" as that term is carried over from § 47-73 and the ownership of record of which is necessary to voter eligibility, § 7-147b (g) now introduces the term "land." "Land," unlike some other terms which may be considered generally of common meaning, is not defined in either the historic district or condominium statutes.[18] The use of the term "land" is significant especially because of the prior reference to "real property" in § 7-147b without a single reference to "land" in that statute prior to subsection (g). It is clear that "real property," quite apart from § 47-73, as used in the Restatement "refers to land." *Lakeshore Financial Corporation* v. *Comstock,* 587 F. Sup. 426, 428 (W.D. Mich. 1984); 1 Restatement, Property § 8. It thus can fairly be said that "land" as used in § 7-147b (g) means real property in the conventional sense; this is further supported by the Restatement comment that "[t]hose interests in land designated [in the Restatement] as 'real property' are also referred to as *'freehold interests.'* "[19] (Emphasis added.) 1 Restatement, Property § 8, comment a. It is just not "land" in § 7-147b (g) that is referred to but *"any* land." (Emphasis added.) "The word 'any' has a diversity of meanings and may be employed to indicate 'all' or 'every' as well as 'some' or 'one.' . . . Its meaning in a given statute depends upon the context and

---

[18] The Condominium Act specifically defines such terms as "property," "building," and "improvements." General Statutes § 47-68a. We do note that § 47-68a in defining "property" states that that "means and includes *the land,* all buildings, all improvements and structures thereon, and all easements, rights and appurtenances belonging thereto . . . . " (Emphasis added.)

[19] We see no conflict between the term "real property" in § 47-73 and defining "land" in § 7-147b (g) as "real property" in the conventional and Restatement sense.

subject matter of the statute." *Muller* v. *Town Plan & Zoning Commission,* 145 Conn. 325, 328, 142 A.2d 524 (1958). We have held it to be too comprehensive a word to receive a narrow construction, and, to find the sense in which it is employed in § 7-147b (g), we look at the wording of the statute, its legislative history and its basic policy. Id., 329; *Donohue* v. *Zoning Board of Appeals,* 155 Conn. 550, 556, 235 A.2d 643 (1967). Given our view of the statutory scheme and the application of the principles to be employed to come to a common sense result, we construe "any" to mean "some" in this case. This is particularly so because what the PTC tenant in common (and the joint tenants) has by virtue of his freehold interest in "land" is an undivided interest therein together with the other "unit owner(s)."

Put another way, because the "common elements" are "all portions of the condominium other than the units," and each "unit owner" has "an undivided interest in the common elements," then each unit owner, whether as a tenant in common or joint tenant, has an undivided interest in some "land." The quality of that undivided interest is freehold in nature, yet each such unit owner owns less than all the freehold at 7–9 Park Street. Each such unit owner is therefore entitled to a vote proportionate to his freehold interest in the "land" there, and that in this case is 1/67 of a vote. The interaction of the historic district and the condominium statutes in this appeal, we point out, will not constrain us in deciding how condominium interests may be characterized in other contexts.

We are not persuaded otherwise by the claim of the defendants that the legislature intended to make the grand list the "focal point of the voting franchise." Although it is true that the legislative preconditions for voting are set out in the statute, the quality of that vote—be it one full vote per unit owner or a fraction

of one full vote for each unit owner—is not. When we balance all the interests, i.e., common sense, a rational result and most of all the carrying out of the statutory purpose, they warrant the result we reach today. As we have said, the interpretation and parsing of terms of common law tenure are not appropriate here in these unprecedented and unanticipated circumstances. While on the New York Court of Appeals, Justice Cardozo said: "Life has relations not capable always of division into inflexible compartments. The moulds expand and shrink." *Glanzer* v. *Shephard,* 233 N.Y. 236, 241, 135 N.E. 275 (1922). This appeal has presented issues, the resolution of which does not neatly fit into any "inflexible compartments."

There is error, the judgment is set aside, and the case is remanded with direction to enter orders consistent with this opinion.

In this opinion the other judges concurred.