STEPHEN MASSAD ET AL. *v.* CITY OF NEW LONDON ET AL.

SUPERIOR COURT     JUDICIAL DISTRICT OF     FILE NO. 524740
NEW LONDON

Memorandum filed November 4, 1993

*Scott & Kanabis,* for the plaintiffs.

*Conway, Londregan & McNamara,* for the defendants.

TELLER, J. The issues presented by the parties' cross motions for summary judgment are (1) whether the referendum duly called by the defendant city and town of New London is a town meeting subject to the provisions of General Statutes § 7-6, and (2) whether the defendants violated the equal protection clauses of the

fourteenth amendment to the United States constitution or article first, § 20, of the Connecticut constitution by refusing to allow the plaintiffs, who are nonresident taxpayers in New London, to vote in a referendum on the approval of a budget and tax rate ordinance.

The court concludes that the referendum is not a town meeting within the provisions of General Statutes § 7-6, and therefore § 7-6 does not apply. The court also concludes that neither equal protection clause was violated.

I

On October 26, 1992, the plaintiffs, Stephen Massad and Terry Brennan, filed a two count complaint against the defendants, the city of New London; Eugenie Kelly, the democratic registrar of voters; Priscilla Ferrigno, the republican registrar of voters; and the following city councilors: Leo Jackson, Dorothy Leib, Jane Glover, Anthony Basilica, William Satti, Warren Miller,[1] and John Strafaci.[2]

The complaint alleges the following facts, none of which is disputed. The plaintiffs are nonresident owners of property in New London. On June 15, 1992, at its "regular meeting," the city council approved a budget and tax rate ordinance that set the mill rate for the city. On June 29, 1992, a petition was filed with the clerk of the city requesting a repeal of the ordinance or, in the alternative, a submission of the ordinance to the electors by referendum. The plaintiffs and other nonresident property owners signed the petition. On June 30, 1992, the council voted to conduct a referen-

---

[1] Conway, Londregan & McNamara, P.C., appeared on October 22, 1992, for all of the defendants. On November 16, 1992, the defendant Warren Miller filed a pro se appearance in addition to the appearance already on file.

[2] On December 3, 1992, the defendant John Strafaci filed a pro se appearance.

dum. On July 7, 1992, the plaintiffs petitioned to vote in the referendum, which was scheduled on August 11, 1992. Their petition to vote was denied by the defendants on July 7, 1992.

In the first count of the complaint, the plaintiffs allege that the actions taken by the defendants in denying the plaintiffs' request to vote in the referendum will result in an illegal vote, contrary to statute and the city charter. In support of this claim, the plaintiffs cite General Statutes §§ 1-1c, 7-157, 9-1, and 7-1 through 7-9c. The plaintiffs, in the second count of the complaint, allege that the defendants' decision not to allow the plaintiffs to vote is capricious and without basis in law. The plaintiffs further allege that such a decision deprives the plaintiffs, as citizens of the United States and Connecticut, of their equal protection rights. The plaintiffs cite the fourteenth amendment to the United States constitution and article first, § 20, of the Connecticut constitution in support of their claim that the defendants are intentionally treating the plaintiffs differently than those resident taxpayers who are similarly interested and affected as property owners.

The plaintiffs request declaratory and equitable relief enjoining the defendants from "conducting a vote of the electors in any referendums until the registrar of voters accepts the plaintiffs' application for admission as an elector and qualifies the said plaintiffs to vote as electors in all referendums." The plaintiffs also request a declaratory judgment "that under the city charter and Connecticut General Statutes, the acts and practices of the defendants deny the plaintiffs their legal entitlements" and "that the acts and practices of the defendants and the provisions of the city charter directing the same are unconstitutional."

On November 25, 1992, the defendants filed an answer in which they admit that pursuant to a peti-

tion, a referendum was held on August 11, 1992. On February 26, 1993, the defendants filed a motion for summary judgment and a memorandum of law. On March 24, 1993, the plaintiffs filed a cross motion for summary judgment and a memorandum of law. The defendants filed a postargument brief dated September 27, 1993.

## II

Summary judgment should be granted if the pleadings and supplementary documentation show " 'that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Johnson* v. *Meehan,* 225 Conn. 528, 534–35, 626 A.2d 244 (1993); Practice Book § 384. The essential facts that the plaintiffs are nonresident property owners and taxpayers who own property in the city of New London assessed in an amount not less than $1000 and were not permitted to vote in the referendum dealing with the budget and mill rate are not in dispute. The parties also do not dispute that the voting process at issue was a referendum.

## III

### State Law and the New London City Charter

The plaintiffs argue that General Statutes § 7-6, which allows nonresidents to vote in some town meetings, preempts the city charter where the charter fails to address specifically the eligibility requirements for voting on referenda. The defendants argue in their postargument brief that "[t]here is no town meeting provided for in the city of New London's charter."

General Statutes § 7-6 provides: "At any town meeting other than a regular or special town election . . . any person who is an elector of such town may vote and any citizen . . . who, jointly or severally, is liable to the town, district or subdivision for taxes

assessed against him on an assessment of not less than one thousand dollars on the last-completed grand list of such town, district or subdivision . . . may vote, unless restricted by the provisions of any special act relating to such town, district or subdivision." See *Hallas* v. *Windsor,* 212 Conn. 338, 340 n.3, 562 A.2d 499 (1989). According to § 7-6, the plaintiffs would have been entitled to vote if the referendum was a town meeting and the city charter did not preclude them from voting. A referendum is defined, however, as "(1) a question or proposal which is submitted to a vote to the electors of a municipality at any regular or special state or municipal election, as defined in this section, (2) a question or proposal which is submitted to a vote of the electors or voters, as the case may be, of a municipality at a meeting of such electors or voters, which meeting is not an election, as defined in subsection (d) of this section, *and is not a town meeting,* or (3) a question or proposal which is submitted to a vote of the electors or voters, as the case may be, of a municipality at a meeting of such electors or voters pursuant to section 7-7 or pursuant to charter or special act . . . ." (Emphasis added.) General Statutes § 9-1 (n). "[A] referendum in which individual voters cast individual ballots in individual voting booths does not constitute a town meeting." *Sadlowski* v. *Manchester,* 206 Conn. 579, 590, 538 A.2d 1052 (1988). "In ordinary usage, the term 'meeting' means an assembly or a gathering for political, social, religious or economic purposes. N. Webster, Third New International Dictionary. [The court has] taken judicial notice of the fact that '[i]n a Connecticut town which has a townhall, the words "town meeting" connote a meeting in the town-hall.' " Id. The New London city charter provides that "[t]he council by five-sevenths vote of its members may submit the [referendum] to the electors

at a special election . . . ." New London City Charter § 31. The submission to the electors of the measures at issue shall be by ballot title. New London City Charter § 32. Therefore, the New London charter provides that the electors will cast individual ballots to vote on a referendum measure, and, accordingly, the referendum cannot be a town meeting. Furthermore, the measure is voted on in a special election, and regular or special town elections are specifically exempt from the provisions of General Statutes § 7-6.

Therefore, as New London's referendum is not a town meeting, General Statutes § 7-6 does not apply, and the plaintiffs' claim on this ground fails.

## IV

### CONSTITUTIONALITY OF RESIDENCY REQUIREMENTS FOR VOTING

The defendants argue that the requirement of residency is a constitutionally permissible limitation on the right to vote. The plaintiffs argue that the residency requirement unconstitutionally impairs their right to vote under the equal protection clauses of the fourteenth amendment of the United States constitution and article first, § 20, of the Connecticut constitution.

" 'Equal protection analysis must commence with a determination of whether a legislative classification is invidious, or "inherently suspect," or whether the legislation impinges upon a fundamental right. Where the legislation impringes upon a fundamental right or creates a suspect classification, then it must be struck down unless justified by a compelling state interest. . . . Where the statute does not involve fundamental rights or suspect classifications, the legislation will withstand constitutional attack if the distinction is founded on a rational basis.' . . ." (Citations omitted.) *Frazier* v. *Manson*, 176 Conn. 638, 645, 410 A.2d 475 (1979).

"Among classifications that have been identified as inherently suspect are those based on alienage, national origin, sex or race. . . . Fundamental interests have been said to include voting, travel, procreation, the right of free speech and the right of a convicted defendant not to be subject to imprisonment beyond the statutory maximum solely by reason of his indigency." (Citations omitted.) Id., 646.

" '[T]he right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights . . . .' " *Kramer* v. *Union School District,* 395 U.S. 621, 626, 89 S Ct. 1886, 23 L. Ed. 2d 583 (1969). "[S]tatutes distributing the franchise constitute the foundation of our representative society. Any unjustified discrimination in determining who may participate in political affairs or in the selection of public officials undermines the legitimacy of representative government." Id.

Nevertheless, "the States have the power to impose reasonable citizenship, age and residency requirements on the availability of the ballot." Id., 625. Even where the actions of a city significantly impact on persons living outside the city, "[n]o decision of this Court has extended the 'one man, one vote' principle to individuals residing beyond the geographic confines of the governmental entity concerned, be it the State or its political subdivisions. On the contrary, our cases have uniformly recognized that a government unit may legitimately restrict the right to participate in its political processes to those who reside within its borders." *Holt Civic Club* v. *Tuscaloosa,* 439 U.S. 60, 68–69, 99 S. Ct. 383, 58 L. Ed. 2d 292 (1978). The plaintiffs cite the following cases in support of their argument that the defendants violated the plaintiffs' right to equal protection under the fourteenth amendment: *Phoenix* v. *Kolodziejski,* 399 U.S. 204, 90 S. Ct. 1990, 26 L. Ed. 2d 523 (1970); *Cipriano* v. *City of Houma,* 395 U.S. 701,

89 S. Ct. 1897, 23 L. Ed. 2d 647 (1969); *Kramer* v. *Union School District,* supra, 395 U.S. 621. The United States Supreme Court has explicitly distinguished these cases, however, dealing with the denial of the franchise[3] to some residents of a governmental entity, which requires a strict scrutiny standard, from cases involving a denial of the franchise to nonresidents of a governmental entity. *Holt Civic Club* v. *Tuscaloosa,* supra, 66–68. Where nonresidents are denied the vote, the fundamental right to vote is not invoked, and the court applies a rational basis test[4] when reviewing a state action under the fourteenth amendment. Id., 70–71. "[T]he Equal Protection Clause is offended only if the statute's classification 'rests on grounds wholly irrelevant to the achievement of the State's objective.' " Id., 71.

The Connecticut equal protection clause has been interpreted in accordance with federal analysis concerning social and economic regulation. *Zapata* v. *Burns,* 207 Conn. 496, 504, 542 A.2d 700 (1988). "The equal protection provisions of the federal and state constitutions have the same meaning and limitations." (Internal quotation marks omitted.) *State* v. *Leary,* 217 Conn. 404, 409, 587 A.2d 85 (1991); see also *Johnson* v.

---

[3] "To 'disfranchise,' according to Ballentine, Law Dictionary (2d Ed.), means '[t]o deprive a person of his citizenship, his franchise or his right of suffrage,' and the right of suffrage has been defined as the right of a man 'to vote for whom he pleases.' . . . It is difficult to see how the term 'disfranchisement' applies here . . . [as] what is involved is not an election but a referendum, which has been defined by our Supreme Court as simply a method of ascertaining the will of members of an association or of a group of people." *Waterbury Homeowners Assn., Inc.* v. *Waterbury,* 28 Conn. Sup. 295, 301–302, 259 A.2d 650 (1969), citing *American Brass Co.* v. *Ansonia Brassworkers' Union,* 140 Conn. 457, 462, 101 A.2d 291 (1953).

[4] In certain circumstances, not applicable here, the United States Supreme Court has applied a mid-tier standard. *Ryszkiewicz* v. *New Britain,* 193 Conn. 589, 597 n.7, 479 A.2d 793 (1984), citing *Mississippi University for Women* v. *Hogan,* 458 U.S. 718, 102 S. Ct. 3331, 73 L. Ed. 2d 1090 (1982).

*Meehan,* 225 Conn. 528, 535, 626 A.2d 244 (1993). A residency requirement does not implicate a fundamental right. *Carofano* v. *Bridgeport,* 196 Conn. 623, 638–40, 495 A.2d 1011 (1985) (discussing right to travel). Connecticut also applies the rational basis test to actions that do not infringe on fundamental rights or impair suspect groups. *Daly* v. *DelPonte,* 225 Conn. 499, 513, 624 A.2d 876 (1993). Thus, "the classification drawn by the statute will not violate the equal protection clause if it is rationally related to a legitimate public interest." *Johnson* v. *Meehan,* supra, 535.

As the plaintiffs are not a "suspect group," nor have their fundamental rights been infringed upon, the court must apply the rational basis test to their claim that their equal protection rights have been violated, and not the more exacting strict scrutiny test.

"The rational basis test requires us to decide first whether there are natural and substantial differences between the classes preferred by the legislation and all others, and then whether the differences identified are logically related to the subject and object of the legislation." *Zapata* v. *Burns,* supra, 207 Conn. 509–10. "In order to determine whether a statutory scheme [or municipal charter] violates the equal protection clause, a court must consider three factors: 'the character of the classification in question; the individual interests affected by the classification; and the governmental interests asserted in support of the classification.' *Dunn* v. *Blumstein,* 405 U.S. 330, 335, 92 S. Ct. 995, 31 L. Ed. 2d 274 (1972)." *Bruno* v. *Civil Service Commission,* 192 Conn. 335, 345, 472 A.2d 328 (1984).

"Because a statute carries with it a strong presumption of constitutionality, a challenger must establish its unconstitutionality beyond a reasonable doubt." *Calfee* v. *Usman,* 224 Conn. 29, 33, 616 A.2d 250 (1992). Every presumption is to be given in favor of the constitution-

ality of the statute. *New Milford* v. *SCA Services of Connecticut, Inc.,* 174 Conn. 146, 148, 384 A.2d 337 (1977). The court presumes "that the legislature intended to reach a reasonable and rational result . . . ." *Fonfara* v. *Reapportionment Commission,* 222 Conn. 166, 200–201, 610 A.2d 153 (1992) *(Berdon, J.,* dissenting). "In construing a statute, the court must search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent." *Calfee* v. *Usman,* supra, 33. Therefore, the court will determine a rational basis where one is not articulated. *Frazier* v. *Manson,* 703 F.2d 30, 34 (2d Cir. 1983), cert. denied, 464 U.S. 934, 104 S. Ct. 339, 78 L. Ed. 2d 308 (1983).

The New London charter provides in article II, § 6: "Every elector of this state, qualified to vote in the town of New London, residing within the territorial limits of the city of New London and registered according to law shall have the right to vote at all city elections. . . ." It also provides in article IV, §§ 30–34, and article V, §§ 35–38, relating to referendums and referendum petitions, respectively, that referendums are to be submitted to the electors.

"The town charter [when] adopted by special act of the General Assembly . . . constitutes the organic law of the municipality. . . . It is well established that a [town's] charter is the fountainhead of municipal powers. . . . The charter serves as an enabling act, both creating power and prescribing the form in which it must be exercised. . . ." (Citations omitted; internal quotation marks omitted.) *West Hartford Taxpayers Assn., Inc.* v. *Streeter,* 190 Conn. 736, 742, 642 A.2d 379 (1983).

" 'Elector' means any person possessing the qualifications prescribed by the constitution and duly admitted to, and entitled to exercise, the privileges of an

elector in a town . . . ." General Statutes § 9-1 (e). Article sixth, § 1, as amended by article IX of the Connecticut constitution prescribes the qualifications of electors to embrace: "Every citizen of the United States who has attained the age of eighteen years, who is a bona fide resident of the town in which he seeks to be admitted as an elector and who takes such oath, if any, as may be prescribed by law, shall be qualified to be an elector." Thus, it is evident from a reading of the city charter, in combination with the statutes and the state constitution, that there are no provisions for non-resident, "qualified taxpayers," such as the plaintiffs here, to vote in town elections, regular or special, or in referendum measures of any sort, whether on appropriations, budgets, authorization of the sale, or purchase or lease of any land or setting a tax rate.

The underpinning of the plaintiffs' equal protection claim seems to rest on General Statutes § 7-6. A brief review of that statute's legislative history in conjunction with the New London charter will help illuminate the court's analysis.

The first version of General Statutes § 7-6 provided: *"Be it further enacted,* That no Person that is not a lawful Inhabitant, a Housholder, and that hath not a freehold[5] Estate rated in the common List at *Nine Dollars* . . . and that is not of the Age of Twenty-one Years, shall be allowed to vote, act, deal or intermeddle in any Town-Meeting in the choice of Officers, granting of rates, or any other Town Affairs . . . . *Provided always,* That no Freeman[6] of this State shall by this Act, be debarred or hindered from voting in any Town-Meeting of that Town whereto he belongs . . . ."

[5] A "freehold" is defined as "[a]n estate for life or in fee." Black's Law Dictionary (6th Ed. 1990).

[6] A "freeman" is defined as "[a] person in the possession and enjoyment of all the civil and political rights accorded to the people under a free government." Black's Law Dictionary (6th Ed. 1990).

(Emphasis in original.) Statutes of Connecticut Rev. of 1796, § 8, 650. Town and Town Officers, ¶8.

Revisions and amendments established threshold residency periods for the right to vote or act in town meetings. General Statutes (Rev. of 1821) tit. 101, § 1, retained in General Statutes (Rev. of 1835) tit. 108, § 1, and General Statutes (Rev. of 1838) tit. 110, § 1 (one year residence in town); General Statutes (Rev. of 1849) c. 2, § 17 (residency in the town for four months, and residency in the state for one year); Public Acts 1877, c. 146, § 29 (six months residency in town).

In 1888, voting eligibility requirements were amended to allow nonresident "qualified" property owners to vote in town meetings. General Statutes (Rev. of 1888) tit. 5, c. 7, § 36. The revision of 1888 provided that "at any town meeting all those male citizens may vote who are of the age of twenty-one years, *and* who have resided in the State the one year, *and* in the town the six months, next preceding, *and* who have been duly admitted as electors in the town, *or* who have a freehold estate not subject to mortgage, rated, in their own names, in the common list or assessment last before completed, at three hundred dollars . . . ." (Emphasis added.) Id.

In 1902, the qualification "unless restricted therefrom by a charter provision" was added to the clause allowing nonresident property owners to vote in town meetings. General Statutes (Rev. of 1902) tit. 10, c. 112, § 1798, retained in General Statutes (Rev. of 1918) tit. 4, c. 15, § 255.

In 1925, the legislature specifically excluded nonresidents from voting in elections for officers. Public Acts 1925, c. 229. Certain property owners (qualified taxpayers) could vote, however, in "any other town meeting or at any meeting of any fire, sewer or school

district or any other municipal subdivision of any town incorporated by special act . . . unless restricted by the provisions of any special act relating to such town, district or sub-division . . . ." Id. The present form of General Statutes § 7-6 is substantially the same as that of the 1925 revision. General Statutes (Rev. of 1930) tit. 5, c. 15, § 270; 1943 Supplement to the General Statutes, tit. 5, c. 15, § 80g (changed the required equity in real estate from $300 to $1000); General Statutes (1949 Rev.) § 496; 1953 Supplement to the General Statutes, tit. 6, c. 21a, § 161c; 1955 Supplement to the General Statutes tit. 6, c. 21a, § 209d (changed the required equity of $1000 to a requirement that the property owner be liable for property taxes on an assessment of not less than $1000); General Statutes (1958 Rev.) § 7-6; Public Acts 1963, No. 642, § 5; Public Acts 1972, No. 127, § 3 (changed the voting age from twenty-one to eighteen).

While § 7-6 had been evolving, so had the form of town governments. The early form prevalent in Connecticut was the selectman town meeting, and it remains the only form of government a town may have today unless it adopts a charter. In 1784, the legislature determined it to be necessary to provide for some towns to adopt a different manner of government, and allowed the city of New London and others to be incorporated by special acts. New London's charter of incorporation adopted a mayor, aldermen, common council and freemen form of government, which included a town meeting, which was the town's legislative body and had the power to levy taxes (§ 5); the common council, elected by the town meeting, had the power to regulate markets and commerce. 1 Conn. Spec. Acts 426, §§ 5, 32 (1784).

The charter enacted in 1784 provided that all town elected officers be both freemen and inhabitants of the city, and there was no provision for nonresident vot-

ing on any matter. See 1 Conn. Spec. Acts 426, §§ 1, 3, 4, 37, 40. In 1921, the legislature amended the New London city charter with respect to elections by stating in § 6: "Every elector of this state, qualified to vote in the town of New London, residing within the territorial limits of the city of New London and registered according to law shall have the right to vote at all city eletions. . . ." 18 Conn. Spec. Acts 710, No. 330, § 16 (1921). At the same time, the 1921 act transformed the form of government to its present form, with a city council, mayor and city manager. Id., §§ 21–29, 39–42.

Thus, it appears that nonresident qualified taxpayers could not vote in New London town meetings from the adoption of its original charter until the present time, with the possible exception of a window opened in 1888 and closed in 1902.

"[The legislature] is always presumed to know all the existing statutes and the effect that its action or non-action will have on any one of them. And it is always presumed to have intended that effect which its action of non-action produces." *Gentry* v. *Norwalk,* 196 Conn. 596, 609, 494 A.2d 1206 (1985).

Hence, it is evident that the legislature provided that towns could prohibit, if they wanted, nonresident "qualified taxpayers" from voting in elections and other matters, as it reaffirmed in the case of New London, when it again amended its charter in 1921. Our Supreme Court has stated: "But the right to vote is not absolute and is subject to regulation by the legislature." *Wrinn* v. *Dunnleavy,* 186 Conn. 125, 142, 440 A.2d 261 (1982). The court has also recognized that nonresident voters may be entirely excluded from voting on the creation of a police district. *Walton* v. *Burdick,* 184 Conn. 200, 439 A.2d 942 (1981). In *Gentry* v. *Norwalk,* supra, 196 Conn. 596, the court approved a statutory scheme that provided that landowners would be

limited to one vote regardless of the size of parcel, so that unit owners in a sixty-seven unit condominium would each have 1/67 of a full vote on the issue of the creation of a proposed historic district. See General Statutes § 7-147b (a); see also 92 Op. Conn. Atty. Gen. 417 (1986), holding that nonresident taxpayers are not permitted to vote on town questions appearing on the ballot at regular or special town elections.

"[H]ome rule legislation was enacted 'to enable municipalities to conduct their own business and control their own affairs to the fullest possible extent in their own way . . . upon the principle that the municipality itself knew better what it wanted and needed than did the state at large, and to give that municipality the exclusive privilege and right to enact direct legislation which would carry out and satisfy its wants and needs.' " *Caulfield* v. *Noble,* 178 Conn. 81, 87, 420 A.2d 1160 (1979). New London's charter, as amended over the years, even though originally created by special act, stands on the same footing and gave New London the same powers. *West Hartford Taxpayers Assn., Inc.* v. *Streeter,* supra, 190 Conn. 736.

The court concludes that a rational basis exists for excluding nonresidents from voting in New London as Tuscaloosa was found to have in *Holt Civic Club* v. *Tuscaloosa,* supra, 439 U.S. 60. It is evident that residents have a greater individual interest in the development and welfare of the town than do nonresidents. They have greater personal knowledge of the city's conditions, and, as inhabitants, they have greater personal stakes in the city's welfare and progress, including the growth of its schools and other institutions. Also, in order to ensure that sufficient revenue will be raised by the town, it is rational to exclude nonresidents who are likely to vote for a lower tax rate because they may not personally and directly benefit from expenditures for the welfare of the town. Even where

the indirect extraterritorial effect of many purely internal municipal actions would have an impact on surrounding areas or as here, on property within the municipality, "no one would suggest that nonresidents likely to be affected by this sort of municipal action have a constitutional right to participate in the political process bringing it about." *Holt Civic Club* v. *Tuscaloosa,* supra, 69.

The court recognizes that the plaintiffs, by virtue of their status as nonresident taxpayers of the city of New London, may be affected by budget and tax measures such as the referendum in which they were excluded from voting. They have not shown, however, that their properties would be wrongfully or discriminatorily assessed, or that they would be wrongfully taxed. If so, they clearly have adequate and appropriate remedies available. See General Statutes §§ 12-111, 12-118, 12-119. Also, in certain cases, taxpayers may seek injunctive relief. See, e.g., *Highgate Condominium Assn.* v. *Watertown Fire District,* 210 Conn. 6, 15, 553 A.2d 1126 (1989).

Furthermore, they are not without any voice in the election of officials who govern their affairs. They are able to vote for officials in the towns in which they reside and for state and federal officers who exercise executive and legislative control over their affairs. And even as nonresident qualified taxpayers, they can continue, through their state representatives, to participate directly in the process that has created the present voting structure, and the powers of the city and state governments.

New London's determination that persons who want to vote on city matters must also reside within its boundaries is a reasonable exercise of its discretion and within the power granted to it to run its own affairs, which is tailored to legitimate governmental concerns

and is not overridden by the interests of persons owning taxable property in the town who prefer to live elsewhere.

"The United States Supreme Court has pointed out that it is not its province to create substantive constitutional rights in the name of guaranteeing equal protection of the laws." *Frazier* v. *Manson,* 176 Conn. 638, 646, 410 A.2d 475 (1979), citing *San Antonio School District* v. *Rodriguez,* 411 U.S. 1, 34, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973). The plaintiff's remedy must be with the legislature.

The plaintiffs, as nonresidents, have not met their heavy burden of proving that the New London charter and resultant municipal action denying them the right to vote on the referendum is unconstitutional beyond a reasonable doubt.

Although the plaintiffs also claim that the municipal action denying them the right to vote as nonresidents violated their rights under article first, § 20, of the Connecticut constitution, they offer no separate analysis thereunder, and therefore the court declines to consider their state constitutional claim. See *State* v. *Mooney,* 218 Conn. 85, 588 A.2d 145, cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991).

Therefore, the court concludes that the residency requirement for voters in a referendum, as in this case, does not violate either the fourteenth amendment to the United States constitution or article first, § 20, of the Connecticut constitution.

Because a referendum is not a town meeting subject to General Statutes § 7-6 and the plaintiffs' equal protection rights were not violated, the plaintiffs' motion for summary judgment must be, and is, denied and the defendants' motion for summary judgment must be, and is, granted.