DOUGLAS E. JOHNSON *v.* JAMES F. MEEHAN, COMMISSIONER OF REVENUE SERVICES, ET AL. (14556)

CALLAHAN, BORDEN, BERDON, NORCOTT and SANTANIELLO, Js.

Argued October 27, 1992—decision released May 11, 1993

*David D. Legere,* with whom was *William H. Narwold,* for the appellant (plaintiff).

*Aaron S. Bayer,* deputy attorney general, with whom were *Robert L. Klein* and *Robert F. Vacchelli,* assistant attorneys general, and, on the brief, *Richard Blumenthal,* attorney general, for the appellees (defendants).

CALLAHAN, J. The principal issue in this appeal is the constitutionality of the Connecticut excise tax on cigarettes purchased by state correctional institutions. The plaintiff, an inmate at the Connecticut correctional institution at Somers, brought an action against the defendants, James F. Meehan, commissioner of revenue services, and Larry R. Meachum, commissioner of correction (hereinafter correction), pursuant to 42 U.S.C. § 1983[1]

---

[1] "[42 U.S.C.] Sec. 1983. CIVIL ACTION FOR DEPRIVATION OF RIGHTS

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other

and General Statutes §§ 52-1[2] and 52-29,[3] challenging the constitutionality of General Statutes § 12-297 as amended by No. 89-16, § 28, of the 1989 Public Acts. The plaintiff sought a declaratory judgment that the statute is unconstitutional, an injunction prohibiting the defendants from enforcing and collecting taxes pursuant to the statute, and an award of costs and attorney's fees. The plaintiff appealed to the Appellate Court from a judgment of the trial court granting the defendants' motion for summary judgment. We transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We affirm the judgment of the trial court.

Prior to 1989, General Statutes § 12-297[4] provided that cigarettes sold to all state institutions for distri-

person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

[2] "[General Statutes] Sec. 52-1. ADMINISTRATION OF LEGAL AND EQUITABLE RIGHTS. The superior court may administer legal and equitable rights and apply legal and equitable remedies in favor of either party in one and the same civil action so that legal and equitable rights of the parties may be enforced and protected in one action. Whenever there is any variance between the rules of equity and the rules of the common law in reference to the same matter, the rules of equity shall prevail."

[3] "[General Statutes] Sec. 52-29. SUPERIOR COURT MAY DECLARE RIGHTS AND LEGAL RELATIONS. (a) The superior court in any action or proceeding may declare rights and other legal relations on request for such a declaration, whether or not further relief is or could be claimed. The declaration shall have the force of a final judgment.

"(b) The judges of the superior court may make such orders and rules as they may deem necessary or advisable to carry into effect the provisions of this section."

[4] General Statutes § 12-297 was originally enacted in 1949; Public Acts 1949, No. 1171; and provided: "The tax imposed under the provisions of section 1979 of the General Statutes (1949 Rev.) shall not apply to cigarettes sold to state institutions for distribution to patients or inmates, or to cigarettes purchased with revolving funds under the jurisdiction of a state institution, when the cigarettes purchased are to be consumed by patients or inmates confined at the institutions."

bution to patients and inmates housed in those facilities were exempt from the excise tax imposed by General Statutes § 12-296.[5] As a result of the amendment to § 12-297 by § 28 of Public Act 89-16, effective April 1, 1989, the exemption no longer applies to cigarettes sold to "correctional institutions."[6] Prior to April 1, 1989, the price of cigarettes purchased by inmates housed at the state's correctional institutions was approximately eighty-five cents per pack for brand name cigarettes and sixty cents per pack for generic cigarettes. As a result of the amendment to the statute, on or about April 1, 1989, the price of cigarettes sold to inmates at correctional institutions rose to approximately $1.50 per pack for brand name cigarettes and $1.10 per pack for generic cigarettes. At that same time, the price of cigarettes at other state institutions ranged from $1.80 per pack for name brands and $1.45 per pack for generic cigarettes at the Veterans Home and Hospital, to $1.25 per pack for brand name cigarettes and $1 per pack for generic cigarettes at Whiting Forensic Institute.[7]

[5] General Statutes (Rev. to 1991) § 12-296 provided: "IMPOSITION OF TAX. A tax is imposed on all cigarettes held in this state by any person for sale, said tax to be at the rate of twenty mills for each cigarette and the payment thereof shall be for the account of the purchaser or consumer of such cigarettes and shall be evidenced by the affixing of stamps to the packages containing the cigarettes as provided in this chapter."

[6] "[General Statutes] Sec. 12-297. EXEMPTION FROM TAX FOR CIGARETTES SOLD TO CERTAIN STATE INSTITUTIONS FOR PATIENTS OR INMATES. The tax imposed under the provisions of section 12-296 shall not apply to cigarettes sold to any state institution other than a correctional institution for distribution to patients or inmates, or to cigarettes purchased with revolving funds under the jurisdiction of any state institution other than a correctional institution, when the cigarettes purchased are to be consumed by patients or inmates confined at such institution."

[7] At the Veterans Home and Hospital, Norwich Hospital, and Connecticut Valley Hospital, all cigarettes are sold in vending machines supplied by an outside vendor. The cigarettes sold at the Veterans Home and Hospital are not exempt from the state sales tax, but are exempt from the cigarette tax. The cigarettes sold at Norwich Hospital and Connecticut Valley Hospital are exempt from neither tax, and the prices that are charged to the patients

For the period of April 1, 1989, through December 31, 1989, the department of revenue services collected approximately $390,352 in taxes from correctional institution inmates pursuant to § 12-297 as amended. From December 1, 1990, to March 31, 1991, 519,000 packs of cigarettes were purchased by correction inmates.[8] It was estimated, at the time this action was filed, that correction's annual sales of cigarettes for 1991 would be 1,550,000 packs, which would result in net cigarette tax revenues of $613,800. The plaintiff is serving a sentence of eighty-five years and ninety days, for convictions of murder, arson and larceny. He works in a special "Private Sector Prison Industries Program," established pursuant to General Statutes § 18-90b,[9] that produces baseball caps for a Maryland

are the same as those charged to the general public. At Fairfield Hills Hospital, there is a commissary where cigarettes are sold on which no sales tax but a cigarette tax is charged.

[8] The volume of cigarettes purchased at the Veterans Home and Hospital and the Whiting Forensic Institute were 60,450 packs and 8620 packs respectively.

[9] "[General Statutes] Sec. 18-90b. PILOT PROGRAM FOR INMATE LABOR IN PRIVATE INDUSTRY. (a) The commissioner of correction is authorized to establish a pilot program involving the use of inmate labor in private industry.

"(b) The commissioner may enter into such contracts as may be necessary to fully implement the pilot program. Such contractual agreements may include rental or lease agreements for state buildings or portions thereof on the grounds of any institution or facility of the department of correction and for any real property needed for reasonable access to and egress from any such building for the purpose of establishing and operating a factory for the manufacturing and processing of goods, wares or merchandise or the provision of service or any other business or commercial enterprise deemed by the commissioner to enhance the general welfare of the inmate population.

"(c) An inmate may participate in the program established pursuant to this section only on a voluntary basis and only after he has been informed of the conditions of his employment.

"(d) No inmate participating in the program shall be paid less than the prevailing wage for work of similar nature in private industry.

company. In March, 1991, he earned $639 gross income and $430 net income for the month.[10] He used this money to purchase cigarettes, envelopes, personal hygiene products, food items, and to pay for child support. He smokes approximately two packs of cigarettes per day, and purchases his cigarettes through the prison commissary.

In his complaint, the plaintiff attacked the constitutionality of § 12-297 on two grounds. He claimed that it impermissibly: (1) requires the plaintiff, but not others similarly situated, to pay a tax on cigarettes in violation of the equal protection clauses of the United States and Connecticut constitutions; and (2) impinges upon his right or privilege to possess or purchase cigarettes while housed in a correctional institution, thereby violating the due process clauses of the United States and Connecticut constitutions. He pursues these same two claims in this appeal. We find both claims unpersuasive and affirm the judgment of the trial court.

I

The plaintiff first claims that the trial court improperly granted the defendants' motion for summary judgment because § 12-297 as amended violates the equal protection clause of the fourteenth amendment to the

"(e) Inmate participation in the program shall not result in the displacement of employed workers and shall not impair existing contracts for services.

"(f) Nothing contained in this section shall be deemed to restore in whole or in part the civil rights of any inmate. No inmate compensated for participation in the program shall be considered an employee of the state.

"(g) The provisions of subsection (j) of section 18-88 shall not apply to any articles, materials or products manufactured or produced by institutional inmates pursuant to this section."

[10] On June 16, 1989, at the time the plaintiff filed his complaint with the trial court, he was earning approximately ninety cents per day. The plaintiff, however, having been employed in the Private Sector Prison Industries Program, later received significantly higher wages pursuant to General Statutes § 18-90b (d).

534

federal constitution[11] and article first, § 20, of the Connecticut constitution.[12] Specifically, the plaintiff argues that the statute unreasonably and arbitrarily distinguishes between inmates who reside in state correctional institutions, to whom the cigarette tax applies, and other similarly situated individuals, who reside in other state institutions and who are exempt from the tax. We do not agree.

In the trial court, the plaintiff and the defendants both filed motions for summary judgment with supporting statements of undisputed facts and affidavits. The court concluded that there was no genuine issue of material fact and that the undisputed facts belied the plaintiff's contention that § 12- 297 is unconstitutional. Concerning the plaintiff's equal protection challenge, the trial court found that there existed several rational bases justifying the legislature's repeal of the cigarette tax exemption as it applies to correction facilities.

Practice Book § 384 provides that summary judgment "shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

[11] The fourteenth amendment to the United States constitution provides in pertinent part: "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws."

[12] Article first, § 20, as amended by article twenty-one of the amendments to the Connecticut constitution, provides in pertinent part: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of . . . physical or mental disability."

Because the plaintiff failed to brief or analyze independently any state constitutional protections, we limit our review to the relevant federal constitutional claim. *State* v. *Joly,* 219 Conn. 234, 258 n.16, 593 A.2d 96 (1991). The plaintiff, citing *Lublin* v. *Brown,* 168 Conn. 212, 219, 362 A.2d 769 (1975), suggests that for the purposes of his equal protection claim, the applicable state and federal provisions should have equivalent meaning.

law." See *Connecticut Bank & Trust Co.* v. *Carriage Lane Associates,* 219 Conn. 772, 780–81, 595 A.2d 334 (1991).

In reviewing the plaintiff's claim that the trial court improperly granted the defendants' motion for summary judgment, we recognize that "[i]n deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the non-moving party. . . ." (Citations omitted; internal quotation marks omitted.) Id., 781. We also recognize, however, that the trial court ruled on the defendants' motion for summary judgment in light of the evidentiary presumption that "[a] party challenging the constitutionality of a statute must prove its unconstitutionality beyond a reasonable doubt." *Perry* v. *Perry,* 222 Conn. 799, 810, 611 A.2d 400 (1992); *Connecticut Building Wrecking Co.* v. *Carothers,* 218 Conn. 580, 590, 590 A.2d 447 (1991); *Bartholomew* v. *Schweizer,* 217 Conn. 671, 675, 587 A.2d 1014 (1991); see *Anderson* v. *Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ("in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden").

Because the plaintiff advances an equal protection claim, we must also ascertain whether the rational basis test or the more stringent strict scrutiny test need be used to assess the constitutionality of § 12-297. In the context of an equal protection challenge to social and economic legislation that does not infringe upon a fundamental right or affect a suspect group, the classification drawn by the statute will not violate the equal protection clause if it is rationally related to a legitimate public interest. *Nordlinger* v. *Hahn,* 505 U.S.      , 112 S. Ct. 2326, 2331, 120 L. Ed. 2d 1 (1992); *Cleburne* v. *Cleburne Living Center, Inc.,* 473 U.S. 432, 439–41, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985). The parties

agree that Public Act 89-16, § 28, by repealing the exemption to the cigarette excise tax for correctional institutions, is social and economic legislation that does not infringe upon a fundamental right or affect a suspect group. Thus they agree that the rational basis test applies.

The United States Supreme Court has recently summarized the rational basis test as applied to social and economic legislation that does not infringe upon a fundamental right or affect a suspect group. *Nordlinger* v. *Hahn,* supra, 2332. "In general, the Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, see *United States Railroad Retirement Board* v. *Fritz,* 449 U.S. 166, 174, 179 [101 S. Ct. 453, 66 L. Ed. 2d 368 (1980), reh. denied, 450 U.S. 960, 101 S. Ct. 1421, 67 L. Ed. 2d 385 (1981)], the legislative facts on which the classification is apparently based rationally may have been considered to be true by the government decisionmaker, see *Minnesota* v. *Clover Leaf Creamery Co.,* 449 U.S. 456, 464 [101 S. Ct. 715, 66 L. Ed. 2d 659, reh. denied, 450 U.S. 1027, 101 S. Ct. 1735, 68 L. Ed. 2d 222] (1981), and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational, see *Cleburne* v. *Cleburne Living Center, Inc.,* [supra, 446]." *Nordlinger* v. *Hahn,* supra.

Moreover, § 12-297 is a tax statute. In the context of tax legislation, a party challenging a statute on equal protection grounds has an even greater burden than equal protection challenges to other social and economic statutes that do not infringe upon a fundamental right or affect a suspect group. "In tax matters, more so than in other fields, legislatures possess considerable liberty in classification." *Gallacher* v. *Commissioner of Revenue Services,* 221 Conn. 166, 181, 602 A.2d 996 (1992); see also *Nordlinger* v. *Hahn,* supra, 2326 (upholding California's property tax scheme under Proposition 13

against equal protection challenge); *Regan* v. *Taxation with Representation of Washington,* 461 U.S. 540, 547, 103 S. Ct. 1997, 76 L. Ed. 2d 129 (1983) (denial of tax exemption to nonprofit lobbying organizations, but with an exception for veterans groups, does not violate equal protection).

Therefore, "the presumption of constitutionality can be overcome only by the most explicit demonstration that the classification is a hostile and oppressive discrimination against particular persons and classes. The burden is on the one attacking the legislative arrangement to negative *every conceivable basis* which might support it." (Emphasis added; internal quotation marks omitted.) *Miller* v. *Heffernan,* 173 Conn. 506, 509–10, 378 A.2d 572 (1977), appeal dismissed, 434 U.S. 1057, 98 S. Ct. 1226, 55 L. Ed. 2d 758 (1978).

Although inmates have rights to equal protection of the law that survive imprisonment; *Lee* v. *Washington,* 390 U.S. 333, 88 S. Ct. 994, 19 L. Ed. 2d 1212 (1968); the trial court could reasonably have found that § 12-297 as amended does not violate the plaintiff's rights to equal protection because the legislature, in enacting the amendment, had a rational basis to justify differential treatment of inmates of state correctional institutions, and inmates and patients residing in other state institutions. The rational basis justifying the statute lies in the distinction that inmates housed in state correctional institutions are more able to pay the cigarette tax than those who are housed in the state's other institutions.

On the basis of the following facts, the trial court concluded that the legislature could reasonably have believed that inmates of correction facilities have greater financial ability than inmates and patients residing in other state institutions, and that this greater financial ability is rationally related to the payment of

the cigarette tax. Inmates of the correction facilities are in prison because they have been convicted of crimes or have been charged with a crime and are awaiting trial. Patients or inmates of the other state institutions, however, reside in those institutions because they are mentally or physically disabled and are either unable to take care of themselves or in need of treatment. Generally, inmates and patients in other state institutions must pay for more of their own living expenses than inmates in state correctional institutions.[13] Moreover, because the high volume of cigarette sales at correction facilities makes it possible for those facilities to buy directly from manufacturers rather than from retailers, inmates in state correctional facilities generally pay less for cigarettes than the patients or inmates in all other state institutions, with the exception of Whiting Forensic Institute.[14] Finally, the legislature could reasonably have determined that inmates in correction facilities are capable of working and that attempts are made to find a job for any inmate who has an interest in doing so.[15]

Consequently, because inmates in state correctional institutions have a greater opportunity to work and have the capacity to earn more income than patients or inmates in other state institutions, the two groups

[13] The plaintiff, as a participant in the Private Sector Prison Industries Program, is required to pay for a variety of his living expenses. Other inmates not involved in this program are not required to pay for such expenses, except for some personal hygiene products.

In other residential state institutions, such as those operated by the departments of mental health and veterans affairs, outside income is subject to assignment to the state to defray the cost of services rendered.

[14] Had the exemption for correction facilities not been repealed, the current selling price of cigarettes at those facilities would be approximately forty cents per pack less. Moreover, in the absence of Public Act 89-16, § 28, the price of cigarettes at the state correctional institutions would have been less than the selling price at any other state institution.

[15] Most inmates who do not work are those who are housed temporarily, such as pretrial detainees and those in transit.

are not similarly situated. The legislature, therefore, had a rational basis to enact legislation imposing a tax on cigarettes purchased by inmates at the correctional facilities without requiring the same tax to be paid by patients and residents in other state institutions.

The plaintiff contends that the statute violates the equal protection clause because a discussion concerning a rational basis differentiating the financial ability between the two groups cannot be found in the legislative history of the 1989 amendment to § 12-297. In making this claim, the plaintiff misconceives the appropriate standard for reviewing an equal protection challenge to legislation that does not infringe on a fundamental right or affect a suspect class. *Nordlinger* v. *Hahn,* supra, 2334. "[T]he Equal Protection Clause does not demand for purposes of rational-basis review that a legislature or governing decisionmaker actually articulate at any time the purpose or rationale supporting its classification." Id. This court's review requires only that the differing financial ability between the two groups "may conceivably or may reasonably have been the purpose or policy of the relevant decisionmaker."[16]

[16] The relevant legislative history of § 28 of Public Act 89-16 indicates that its purpose was to correct what was perceived to be a "gross error" in the original legislation and to raise revenues for programs addressing the substance abuse problem in Connecticut. Although the "gross error" is not specified, it is clear that the legislature in 1989 believed that the legislature in 1949 erroneously assumed that inmates housed in correctional institutions were similarly situated with inmates and patients in other state institutions with respect to the cigarette tax exemption. See Remarks of Representative Lenny T. Winkler, 32 H.R. Proc., Pt. 6, 1989 Sess., pp. 1891–92.

In 1949, while discussing General Statutes § 12-297 as originally enacted, Representative John P. Cotter offers the only relevant legislative history at that time: "There have been many complaints from the Veterans Hospitals, institutions and from other state agencies because some of the patients have been forced to pay the cigarette tax. Many in these institutions do not earn over ten or fifteen cents a day and they have to pay the cigarette tax. I have been informed that these taxes only amount to a sum of something less than $51 a year." 3 H.R. Proc., 1949 Sess., p. 123.

Id. "The legislature, cognizant of the constitutional guarantees of equal protection, must be deemed to have sought to attain a rational and sensible result that avoids placing a statute in constitutional jeopardy." (Internal quotation marks omitted.) *Murray* v. *Lopes*, 205 Conn. 27, 36, 529 A.2d 1302 (1987).

The plaintiff also argues that § 12-297 is unconstitutional on equal protection grounds because it impermissibly discriminates among members within the class it establishes. According to the plaintiff, the statute, as applied, treats inmates of state correctional institutions differently by taxing cigarettes sold to those inmates but not taxing those sold to convicted inmates placed for treatment in state hospitals. The plaintiff maintains that because inmates who need treatment and who reside in facilities such as Whiting Forensic Institute are exempt from the cigarette tax during their stay, while inmates of correctional institutions are not, § 12-297 irrationally and arbitrarily creates a class within a class.[17]

We are not persuaded by the plaintiff's claim that the differential treatment of subclasses within the class of "inmates" is not rationally related to the legitimate governmental interest of providing relief to those who are unable to pay while requiring those who are able to pay, to bear the burden of a cigarette tax. A classification drawn in a tax statute " 'is not offensive merely because it is not made with mathematical nicety.' " *Miller* v. *Heffernan,* supra, 512. The vast majority of correction inmates reside in correction facil-

---

[17] Approximately 1776 sentenced inmates under the jurisdiction of correction reside in the department of mental health facilities of Whiting Forensic Institute, Connecticut Valley Hospital, and various halfway houses. Thirty-three of these inmates are housed in Whiting Forensic Institute. Whiting is the state's only maximum security facility for the criminally insane. At the time of this appeal, it was a 100 bed facility with two wards containing approximately 36 beds dedicated to transfers from correction.

ities. Because those inmates who are transferred from correction facilities to other state institutions may not have to pay the cigarette tax during the period of their transfer does not mean that the constitutionality of § 12-297 is undermined. Even if some inmates in correction facilities may be temporarily transferred to other state institutions, the legislature may reasonably have deduced that the transferred inmates were then similarly situated to those housed in facilities where the tax was an unacceptable burden and were no longer similarly situated to inmates housed in correction facilities. For example, both correction inmates temporarily transferred to department of mental health facilities and patients who are regularly housed there are likely to be in need of psychiatric treatment. Both inmates and patients in such facilities are, therefore, less likely to be able to work and earn wages than inmates of correction facilities. Thus, the fact that § 12-297 as amended applies to inmates of correction facilities, but not to inmates transferred to other state facilities, does not render it unconstitutional.

The plaintiff relies on *State* v. *Reed,* 192 Conn. 520, 473 A.2d 775 (1984), to argue that the classification in § 12-297 between inmates housed in state correctional institutions and inmates and patients housed in other state facilities cannot withstand constitutional scrutiny if the differential treatment is justified merely on financial grounds. In *Reed,* we addressed the issue of whether it was permissible under General Statutes (Rev. to 1983) §§ 17-317[18] and 53a-47 (h)[19] to require

---

[18] General Statutes (Rev. to 1983) § 17-317 provided: "When any person, charged with any offense punishable by fine or imprisonment or both, has been found not guilty because of mental illness and, by reason of such mental illness, has been committed for confinement or treatment to any institution supported in whole or in part by the state, the expense for the support and treatment of such person while so committed shall be computed and paid for in the same manner as is provided in this chapter for patients committed by courts of probate."

[19] General Statutes (Rev. to 1983) § 53a-47 (h) provided: "The expense of confinement, support and treatment of any person confined hereunder

those confined in a state mental hospital after an acquittal by reason of mental disease or defect to pay hospital expenses while not requiring convicted prisoners to pay such expenses. Id., 525–26. The court in *Reed* noted that the comparative financial ability of such insanity acquittees and inmates temporarily removed from correction facilities for treatment was not sufficient to justify differential treatment concerning payment of hospital expenses. Id., 529.

Our decision in *Reed* differs from this case in three respects. First, *Reed* did not address tax legislation. Thus, the legislation challenged in *Reed,* §§ 17-317 and 53a-47 (h), was not afforded the "especially broad latitude" which, consistent with state and federal law, applies to tax legislation. *Regan* v. *Taxation with Representation of Washington,* supra. Second, this case concerns the cigarette tax exemption and not payment of necessary medical expenses. The legislature, in amending § 12-297, could reasonably have determined that payment of a cigarette tax but not the payment of medical expenses was justified by the difference in financial ability between inmates of correction institutions and patients and inmates in other state institutions. Finally, this case involves comparisons between different groups than those in *Reed.* In that case, comparisons were made between acquittees and convicted inmates both housed in the same medical facilities. In this case, the comparison is between inmates of state correctional facilities and inmates and patients in the other institutions. Therefore, the legislature could reasonably have assumed that inmates housed in correction facilities, unlike all other inmates and patients housed in other state institutions, possess the ability to work, and consequently, are more financially able

shall be computed and paid for in accordance with the provisions of section 17-205a and chapter 308." This section has since been repealed.

to pay the cigarette tax. Consequently, *Reed* does not control this case.

In summary, we agree with the trial court that, even viewed in the light most favorable to the plaintiff, he has failed to satisfy his burden of demonstrating, beyond a reasonable doubt, that there is no rational basis on which to support the classifications drawn in § 12-297 as amended. The statute therefore does not violate his constitutional right to equal protection.

## II

The plaintiff next claims that the trial court improperly granted the defendants' motion for summary judgment because § 12-297 violates both his substantive and procedural rights to due process under the state and federal constitutions.[20] We address the plaintiff's substantive and procedural due process claims separately.

## A

The plaintiff argues that § 12-297 violates his right to substantive due process under the fourteenth amendment to the federal constitution.[21] Specifically, the plaintiff claims that the repeal of the exemption from the cigarette tax for state correctional institutions, having caused a substantial increase in the cost of cigarettes sold in those institutions, deprived him of his right to possess and buy cigarettes and effectively amounts to a potential confiscation of property. We are not persuaded.

We reiterate that the party challenging the constitutionality of a statute bears the burden of proving that

[20] Because the plaintiff failed to brief or analyze independently any state constitutional protections, we limit our review to the relevant federal constitutional claim. *State* v. *Joly,* 219 Conn. 234, 258 n.16, 593 A.2d 96 (1991).

[21] The fourteenth amendment to the United States constitution provides in pertinent part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

the statute is unconstitutional beyond a reasonable doubt. *Perry* v. *Perry,* supra. Moreover, "[e]xcept in unusual circumstances, the due process clause does not limit the taxing power of the legislature. . . . [T]hat clause is applicable to a taxing statute . . . only if the act be so arbitrary as to compel the conclusion that it does not involve an exertion of the taxing power, but constitutes, in substance and effect, the direct exertion of a different and forbidden power, as, for example, the confiscation of property." (Internal quotation marks omitted.) *Miller* v. *Heffernan,* supra, 516–17. In determining whether a tax constitutes "the direct exertion of a different and forbidden power," we must first inquire whether the tax entails a "flagrant and palpable inequality between the burden imposed and the benefit received." (Internal quotation marks omitted.) Id., 517.

Contrary to the plaintiff's contention, the burden imposed by § 12-297 does not far outstrip the benefit received by the state. Because of the high volume of cigarette sales at state correctional institutions, the revenues derived from the tax will be substantial, and will aid in funding state substance abuse programs, one of the purposes articulated by the legislature in repealing the exemption to the cigarette tax. See Remarks of Representative Lenny T. Winkler, 32 H.R. Proc., Pt. 6, 1989 Sess., pp. 1891–92. Furthermore, the excise tax now made applicable to inmates housed in correction facilities also has the potential to enhance public health by adding an economic incentive to reducing their consumption of tobacco. The burden imposed, therefore, is not disproportionate to the benefit derived by the state and its taxpayers.[22]

[22] The capacity simultaneously to raise revenue and enhance public health has made the tobacco excise tax an attractive public policy tool. Surgeon General's Report, Reducing the Health Consequences of Smoking (1989) p. 527.

Moreover, we fail to see how the repeal of the cigarette tax exemption results in the confiscation of any property interest in which the plaintiff has due process rights. Although the legislative history concerning the repeal of the exemption may suggest that the legislature in 1989 regarded the exemption applicable to state correctional institutions with some distaste, as a "gross error" in dire need of correction,[23] this view does not amount to the exertion of a "forbidden power" to accomplish an illegitimate result, especially given the circumstances at the time the statute was amended. Prior to the amendment of § 12-297, inmates housed in correction institutions were paying far less for cigarettes than the public or the inmates, patients or residents in any other state facilities.[24] The amendment served to rectify a situation that the legislature viewed as an apparent oversight and an inequity in the original enactment of § 12-297. As a consequence of the amendment, the plaintiff must now pay only the same tax on cigarettes that the general public pays.[25]

This additional burden on inmates, however, does not result in the potential confiscation of the plaintiff's property. Through the Private Sector Prison Industries Program, the plaintiff earned enough monthly income to purchase an ample supply of cigarettes. The fact that he has other expenses does not prevent him from using his income to purchase and possess cigarettes through the prison commissary. We therefore fail to see how

---

[23] See footnote 16.

[24] Patients in the Veterans Home and Hospital must be certified by a doctor as being disabled and requiring specialization. They are unable to work. Patients in the facilities of the departments of mental health and mental retardation, who are engaged in work, often only work on a very limited basis compared with those inmates who work at correction facilities.

[25] The plaintiff ultimately will pay less for cigarettes than the public and those at most other state institutions because the large volume of cigarette sales at correction allows it to purchase cigarettes directly from the manufacturers.

the increase in the cost of cigarettes resulting from the repeal of the exemption previously enjoyed by inmates is a confiscation of property or an unjustified assertion of the state's taxing power. We conclude that the plaintiff's substantive due process argument cannot prevail.

## B

The plaintiff finally claims that § 12-297 violates his right to procedural due process. He argues that the rules and practices of correction have created a constitutionally protected property interest to buy and possess cigarettes and that the repeal of the cigarette tax exemption, resulting in higher cigarette prices, has deprived him of that interest and has consequently violated his right to due process of the law.

"In order to prevail on his due process claim, the plaintiff must prove that: (1) he has been deprived of a property interest cognizable under the due process clause; and (2) the deprivation of the property interest has occurred without due process of law." *Tedesco v. Stamford,* 222 Conn. 233, 241, 610 A.2d 574 (1992). In the context of the applicable rules in a correctional facility, procedural due process is only required to be afforded when a life, liberty or property interest is at stake. *Kentucky Department of Correction v. Thompson,* 490 U.S. 454, 460, 109 S. Ct. 1904, 104 L. Ed. 2d 506 (1989); see also *Asherman v. Meachum,* 213 Conn. 38, 50, 566 A.2d 663 (1989). The plaintiff asserts that because correction has historically kept wages roughly commensurate with the cost of cigarettes, and because it has allowed the plaintiff to purchase and possess up to six cartons of cigarettes, he has a constitutionally protected property interest, created by state action, to continue to do so. He argues further that even though this asserted right may seem insignificant, it nonetheless is a constitutionally protected property

interest to the extent that it has been created by the ingrained practices of correction.

We agree with the plaintiff that it is improper to measure the significance of any constitutionally protected interest by comparing the interest asserted with other interests already deemed worthy of protection. *Kentucky Department of Correction* v. *Thompson,* supra, 461. Neither correction rules nor practices, however, guarantee the price of cigarettes, nor do they create a property right in the plaintiff to purchase and possess inexpensive cigarettes. The plaintiff, moreover, cannot complain that he has been deprived of any state created right to purchase and possess cigarettes because he has failed to demonstrate that the wages that he earns through the Private Sector Prison Industries Program are insufficient to enable him to purchase enough cigarettes at the current price to maintain his smoking habit. Further, § 12-297 has no effect on correction rules enabling the plaintiff to possess up to six cartons of cigarettes. Because the plaintiff has failed to prove the deprivation of a property interest, his claim that the repeal of the exemption to the cigarette tax previously extended to correctional institutions violates his right to procedural due process and fails to afford him procedural safeguards is without merit.

The judgment is affirmed.

In this opinion BORDEN, NORCOTT and SANTANIELLO, Js., concurred.

BERDON, J., dissenting. The issue in this case is not, as the majority puts it, the constitutionality of the Connecticut excise tax on cigarettes purchased by state correctional institutions. Rather, the issue is whether revoking the exemption from the excise tax for cigarettes sold in state correctional institutions, while retaining such an exemption for cigarettes sold in other

state institutions, violates the fourteenth amendment to the United States constitution.[1]

For approximately forty years, the state exempted from the excise tax all cigarettes sold to state institutions[2] for distribution to inmates and patients confined in those institutions. Upon enactment of No. 89-16, § 28, of the 1989 Public Acts (hereinafter § 28), the exemption was repealed for cigarettes sold to correctional institutions for distribution to inmates. Section 28 effectively placed a minimum tax of twenty mills on each cigarette sold to an inmate of a facility under the control of the commissioner of correction, but continued the excise tax exemption for *inmates* and others housed in other state institutions such as the Whiting Forensic Institute, mental health facilities, the Veterans Home and Hospital, and mental retardation

---

[1] The plaintiff claims violations of both the state and federal equal protection clauses. Although there are substantial differences between the language of the state's two equal protection clauses (i.e., article first, § 1, and article first, § 20, as amended by articles fifth and twenty-first) and the fourteenth amendment, the plaintiff in challenging this *economic* regulation does not claim that the state provisions provide any greater protection than the federal equal protection clause. Accordingly, my analysis and conclusions are predicated solely on the fourteenth amendment to the United States constitution.

[2] Prior to the enactment of No. 89-16, § 28, of the 1989 Public Acts, General Statutes (Rev. to 1989) § 12-297 provided: "The tax imposed under the provisions of section 12-296 shall not apply to cigarettes sold to state institutions for distribution to patients or inmates, or to cigarettes purchased with revolving funds under the jurisdiction of state institutions, when the cigarettes purchased are to be consumed by patients or inmates confined at such institutions."

General Statutes (Rev. to 1991) § 12-296 provided: "A tax is imposed on all cigarettes held in this state by any person for sale, said tax to be at the rate of twenty mills for each cigarette and the payment thereof shall be for the account of the purchaser or consumer of such cigarettes and shall be evidenced by the affixing of stamps to the packages containing the cigarettes as provided in this chapter."

General Statutes § 12-296a provides for the imposition of additional taxes if the federal rate of taxation on cigarettes falls below certain levels.

facilities. Section 28 nearly doubled the cost of cigarettes for inmates located in correctional institutions.[3]

Prior to the revocation of the tax exemption, most of the inmates at correctional institutions who worked could purchase one pack of cigarettes per day after paying for personal items, such as envelopes, soap, deodorant, and other personal hygiene and food items. This reflected the historical basis for the payment of wages to inmates—that is, inmates were paid for their labor at a rate that enabled them to purchase one pack of cigarettes per day.[4] Since inmate wages were not increased after § 28 was enacted, the parity between work and cigarettes was completely destroyed.

The plaintiff, Douglas E. Johnson, an inmate serving a sentence of eighty-five years for murder, arson and larceny, brought this action against the defendant James F. Meehan, commissioner of revenue services,[5] seeking, among other things, a judgment declaring that the revocation of the exemption by § 28 violated

[3] Cigarettes cost inmates eighty-five cents per pack (sixty cents per pack for generic brands) before the repeal of the exemption, and $1.50 per pack ($1.10 per pack for generic brands) thereafter.

[4] In his May 24, 1990 deposition, Larry R. Meachum, commissioner of correction, explained this historical parity between inmate employment and the cost of cigarettes as follows: "Historically back in the old, old days inmates did not get paid anything, they just worked, and then at some point in past generations corrections [facilities] across the country, not just in Connecticut, started to give inmates cigarettes as part of their incentive or reward or enticement to be able to work, and it was minim[al], but it seemed to be a matter of compassion. Through the years some inmates did not smoke, and so those that smoked got something, those who did not smoke did not get anything. So when institutions started to give them money, they gave them money equal to the [cost of a] pack of cigarettes, and if they wanted to buy cigarettes, they could do that, and if they wanted to spend it in the commissary, they could do that, but they would keep their pay at that level. So it was to some extent a belief . . . in corrections that we should keep the two very commensurate."

[5] Larry R. Meachum, commissioner of correction, is also named as a defendant. Meachum was not given an opportunity to express his views on the elimination of the exemption for inmates in correctional facilities before the legislature adopted No. 89-16, § 28, of the 1989 Public Acts.

his constitutional right to equal protection. Because I believe that § 28 deprives the plaintiff of these rights, I would reverse the trial court and remand the case with instructions to render summary judgment in favor of the plaintiff, and for further proceedings.

I agree with the majority that great deference should be afforded to the legislature when it establishes economic classifications. "The appropriate standard of review is whether the difference in treatment . . . rationally furthers a legitimate state interest. In general, the Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification . . . the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker . . . and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational . . . . This standard is especially deferential in the context of classifications made by complex tax laws." (Citations omitted.) *Nordlinger* v. *Hahn,* 505 U.S.     , 112 S. Ct. 2326, 2332, 120 L. Ed. 2d 1 (1992). I also agree that, generally, "[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." (Internal quotation marks omitted.) *Miller* v. *Heffernan,* 173 Conn. 506, 510, 378 A.2d 572 (1977), appeal dismissed, 434 U.S. 1057, 98 S. Ct. 1226, 55 L. Ed. 2d 758 (1978).

Nevertheless, I must depart from the majority's analysis in this particular case. It is clear, as the majority concedes, that persons do not forfeit their rights under the fourteenth amendment just because they are incarcerated following conviction of a crime. See *Lee* v. *Washington,* 390 U.S. 333, 88 S. Ct. 994, 19 L. Ed. 2d 1212 (1968). Further, although the legislature possesses the "greatest freedom" in making classifications for taxing purposes; *Harbor Ins. Co.* v. *Groppo,* 208 Conn. 505, 510, 544 A.2d 1221 (1988); these classifications

must bear some semblance of rationality. *Circuit-Wise, Inc.* v. *Commissioner of Revenue Services,* 215 Conn. 292, 301, 576 A.2d 1259 (1990). Rational basis review is not merely "a toothless" scrutiny. *Mathews* v. *Lucas,* 427 U.S. 495, 510, 96 S. Ct. 2755, 49 L. Ed. 2d 651 (1976). The legislative power to create classifications is not unlimited; even tax classifications "cannot be arbitrary but must rest upon some ground of difference having a fair and substantial relation to the object of the legislation." (Internal quotation marks omitted.) *Harbor Ins. Co.* v. *Groppo,* supra, 510–11.

The Supreme Court of the United States has held that when the classification disadvantages a politically powerless or unpopular group, the record must affirmatively establish a rational basis for the classification, even though heightened scrutiny is not required. In other words, in situations in which the disadvantaged group has no political power or is recognized as being unpopular and subject to political bashing, the court has been unwilling to uphold a classification based upon a state of facts that can reasonably be conceived.[6]

---

[6] This approach has been criticized by legal scholars. I am adopting it only because the plaintiff's case is predicated on the fourteenth amendment, and this analysis has been employed by a majority of the United States Supreme Court. Professor Tribe points out: "This sporadic move away from near-absolute deference to legislative judgment seems to be a judicial response to statutes creating distinctions among classes of residents based on factors the Court evidently regards as in some sense 'suspect' but appears unwilling to label as such. While there may be grounds for the reluctance to proliferate new categories of classifications overtly triggering closer scrutiny, its *covert* use under the minimum rationality label presents dangers of its own. The lack of openly acknowledged criteria for heightened scrutiny permits arbitrary use of the type of inquiry undertaken in *Cleburne* [v. *Cleburne Living Center, Inc.,* 473 U.S. 432, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985)], for which courts will remain essentially unaccountable. With no articulated principle guiding the use of this more searching inquiry, even routine economic regulations may from time to time succumb to a form of review reminiscent of the *Lochner* [v. *New York,* 198 U.S. 45, 25 S. Ct. 539, 49 L. Ed. 937 (1905)] era." (Emphasis in original.) L. Tribe, American Constitutional Law (2d Ed. 1988) § 16-3, p. 1445.

In my view, rational basis review should be abandoned in favor of a higher level of scrutiny when a legislative classification burdens the politically

Instead, the facts that are necessary to establish a rational basis for the classification must be established in the record.

For example, in *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U.S. 432, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985), the court reviewed an equal protection challenge to a zoning ordinance that required a special permit to operate a group home for the mentally retarded, but not a nursing home, boarding house, hospital or other group living facility. The court held that, for the ordinance to be upheld, the "record" had to reveal a legitimate and rational basis for treating the retarded differently from other groups. Id., 448. The court rejected the rationales for the ordinance offered by the defendant city, stating: "At least this record does not clarify how, in this connection, the characteristics of the intended occupants of the . . . [group home for the retarded] rationally justify denying to those occupants what would be permitted to groups occupying the same site for different purposes. . . . The short of it is that requiring the permit in this case appears to us to rest on an irrational prejudice against the mentally retarded . . . ." Id., 450.

---

powerless or unpopular, or when the only time that a purpose is advanced for a classification is in the argument of counsel. This approach was used in *Schweiker* v. *Wilson*, 450 U.S. 221, 101 S. Ct. 1074, 67 L. Ed. 2d 186 (1981), in which four members of the court held that a heightened review should be employed. "When a legislative purpose can be suggested only by the ingenuity of a government lawyer litigating the constitutionality of a statute, a reviewing court may be presented not so much with a legislative policy choice as its absence. In my view, the Court should receive with some skepticism post hoc hypotheses about legislative purpose, unsupported by the legislative history. When no indication of legislative purpose appears other than the current position of the Secretary, the Court should require that the classification bear a 'fair and substantial relation' to the asserted purpose. See *F.S. Royster Guano Co.* v. *Virginia*, 253 U.S. 412, 415 [40 S. Ct. 560, 64 L. Ed. 989] (1920). This marginally more demanding scrutiny indirectly would test the plausibility of the tendered purpose, and preserve equal protection review as something more than 'a mere tautological recognition of the fact that Congress did what it intended to do.' " Id., 244-45 (Powell, J., dissenting).

Similarly, in *Plyler* v. *Doe,* 457 U.S. 202, 102 S. Ct. 2382, 72 L. Ed. 2d 786, reh. denied, 458 U.S. 1131, 103 S. Ct. 14, 73 L. Ed. 2d 1401 (1982), the court invalidated on equal protection grounds a Texas statute that excluded Mexican children who were illegal aliens from the public schools. The court stated: "[W]e are unable to find in the congressional immigration scheme any statement of policy that might weigh significantly in arriving at an equal protection balance concerning the State's authority to deprive these children of an education." Id., 224–25. The state offered three rationales for the statute—that it protected the state against an influx of illegal immigrants, that undocumented children imposed special burdens on the school system that made it hard to provide high quality education, and that undocumented children are less likely to remain in the state and put their education to use there. Id., 228–30. The court, however, rejected all three rationales because they were unsupported by the record.[7] See also *United States Department of Agriculture* v. *Moreno,* 413 U.S. 528, 534, 93 S. Ct. 2821, 37 L. Ed. 2d 782 (1973) (invalidating legislation intended to prevent "hippies" and "hippie communes" from participating in the food stamp program, since equal protection "must at the very least mean that [the] . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest" [emphasis in original]); *Weber* v. *Aetna Casualty & Surety Co.,* 406 U.S. 164, 92 S. Ct. 1400, 31 L. Ed. 2d 768 (1972) (invalidating, on equal

[7] In rejecting these three rationales, the court in *Plyler* v. *Doe,* 457 U.S. 202, 102 S. Ct. 2382, 72 L. Ed. 2d 786, reh. denied, 458 U.S. 1131, 103 S. Ct. 14, 73 L. Ed. 2d 1401 (1982), stated: "There is no evidence in the record suggesting that illegal entrants impose any significant burden on the State's economy"; id., 228; "the record in no way supports the claim that exclusion of undocumented children is likely to improve the overall quality of education in the State"; id., 229; "the record is clear that many of the undocumented children . . . will remain in this country indefinitely, and that some will become lawful residents or citizens . . . ." Id., 230.

protection grounds, a workers' compensation benefit statute that disadvantaged unacknowledged illegitimate children of deceased workers).

Accordingly, when a politically powerless or unpopular group is subjected to a legislative classification that significantly disadvantages it, the state not only must advance a justification that is rationally related to a legitimate state interest, but must also provide support for its claim in the record. *Cleburne* v. *Cleburne Living Center, Inc.,* supra, 440, 448–50.

Just as the mentally retarded, illegal alien children, hippies and illegitimate children are politically powerless and unpopular, so too are prisoners convicted of crimes. *Rhodes* v. *Chapman,* 452 U.S. 337, 358, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981) (Brennan, J., concurring). This point was driven home during the legislative debate on § 28. One legislator who was amused by the hardship § 28 would impose on prisoners brought laughter from the House of Representatives when, citing "good public policy," he quipped: "I can't help but think that we should not raise this tax, because we should allow . . . [the prisoners] to smoke more . . . die sooner, get out of jails quicker and save money." 32 H.R. Proc., Pt. 6, 1989 Sess., p. 1893.

Section 28 creates two sets of classifications, both of which violate the plaintiff's constitutional right to equal protection. First, there is the distinction between inmates who purchase cigarettes in a correctional institution who must pay the excise tax and all others who purchase cigarettes in other state facilities, including other inmates. The majority holds that this classification is rational because "inmates in state correctional institutions have a greater opportunity to work and have the capacity to earn more income than patients or inmates in other state institutions . . . ." I disagree.

The undisputed evidence before the trial court does not support the majority's conclusion. Although the facts presented in the parties' motions for summary judgment are confusing, it appears that approximately 33 percent of inmates are employed, 10 percent of mental health patients are employed, and 27 percent of mental retardation wards are employed. The evidence in the record simply does not support the conclusion of the trial court and the majority that the inmates have a greater financial ability to pay the resultant higher cost of cigarettes. The defendants admit in the documents supporting their motion for summary judgment that persons institutionalized outside the correction department receive, in addition to compensation for constructive work performed, compensation from the patient worker program, compensation from the workshop and volunteer service funds, and income from social security, veteran's disability benefits, private pensions and the like.

The majority acknowledges that the general pay scale for inmates incarcerated in correctional institutions ranges from seventy-five cents to $2.40 per day for institutional work, and twenty-nine cents to seventy-one cents per hour for work in the regular prison industries program. From these funds, inmates must pay for personal items.

The majority's suggestion that the plaintiff earns $639 in gross income and $430 in net income monthly, without more, is misleading. The plaintiff works in a special pilot program. Under this program, the plaintiff must pay a variety of expenses, including federal and state taxes, restitution payments, support for dependents, travel expenses to and from work, and the cost of prison room and board. See General Statutes §§ 18-90c and 18-101. Indeed, from the approximately $110 per week he nets after taxes, the plaintiff must pay the following: $25 for room and board, $15 for other

food, and $65 for child and family support. This leaves the plaintiff with a net income of $5 per week, or a mere seventy-one cents per day. This is hardly sufficient to justify the conclusion that he and other inmates are more able to pay the excise tax than persons confined in other state institutions.

It is clear that any alleged distinction based upon the ability to pay will not pass muster in this case. Furthermore, the record is clear that the vast majority of persons confined in institutions—whether it be penal facilities, hospitals or retardation homes—do not work. Therefore, no rational classification can be made on the basis of the person's status or location. Any such classification must be regarded as "so attenuated as to render the distinction arbitrary or irrational" and therefore violative of the equal protection clause. *Cleburne* v. *Cleburne Living Center, Inc.,* supra, 446.

Further, there is not a scintilla of evidence in the legislative history of § 28 to support the ability to pay justification now advanced by the majority. Instead, the history reveals that the legislature wanted to raise additional revenues and felt that prisoners in correctional institutions did not deserve the same preferential treatment that persons confined in other state institutions received.[8] The legislature sought further to

---

[8] One legislator argued: "Today we have proposals before us to tax the honest, hardworking citizens of the State of Connecticut, while we have convicted felons, people who have raped, who have murdered, who have maimed some of our own constituents getting a free ride and not paying their minimal fair share of taxes.

"Do I need to remind any of you that it costs approximately $20,000 per year per inmate for the State of Connecticut, for us to house these individuals. I only believe it fair that they pay their minimal share of taxes, and I would hope that this would be a bipartisan effort and be unanimously adopted." 32 H.R. Proc., Pt. 6, 1989 Sess., pp. 1892–93.

Another said: "[U]nder our current system, nobody stays in jail very long. They are not there long enough. Five year sentence for selling drugs? You serve six months. Let's not give them a tax break to go with the other. Let's not [let] them stock up on cigarettes in their brief stay in our prison

punish persons in the plaintiff's class for their crimes, a goal that has no relevance to the revenue raising purpose of the statute and cannot constitutionally support § 28.

In *Rinaldi* v. *Yeager,* 384 U.S. 305, 86 S. Ct. 1497, 16 L. Ed. 2d 577 (1966), the court considered a statute that required unsuccessful criminal appellants to reimburse the state for the costs of their trial transcripts out of their prison earnings. Unsuccessful appellants who were not incarcerated but instead were fined did not have to reimburse the state. The court invalidated the statute, because the distinction between incarcerated and nonincarcerated appellants was unrelated to the purpose of the statute, which was reimbursement of the cost of furnishing transcripts. The court noted that the "Equal Protection Clause does require that, in defining a class subject to legislation, the distinctions that are drawn have some relevance to the purpose for which the classification is made." (Internal quotation marks omitted.) Id., 309.

The second classification established by § 28 distinguishes between inmates housed at state correctional institutions and inmates confined in state hospitals, since only the latter are allowed to maintain the tax exemption. The plaintiff's challenge to this classification is not that the classification lacks "mathematical nicety," as the majority characterizes it. Rather,

---

system. We have got enough problems there. Let's at least let convicted felons that don't do much time, pay tax on their cigarettes while they are doing that little tiny bit of time.

"We have got enough problems in the system. Don't give them a tax break, which we have been giving them, hopefully inadvertently, all along. Let's adopt this very reasonable amendment and the funds go to Drug and Alcohol Abuse Council, under this amendment, so that we can deal with some of the drug abuse problems at the same time." 32 H.R. Proc., Pt. 6, 1989 Sess., pp. 1893–94.

the plaintiff rightly asserts that this classification is impermissible under *State* v. *Reed,* 192 Conn. 520, 473 A.2d 775 (1984).

In *State* v. *Reed,* supra, this court invalidated a statute that required a defendant confined to a mental institution following an insanity acquittal to reimburse the state for the cost of his or her care. A convicted defendant who was confined in a mental institution was not required to reimburse the state. Id., 525. This court held that the statutory distinction between insanity acquittees and convicted prisoners violated the state and federal equal protection clauses because the state could not point to "any . . . factor which might reasonably support the distinction the legislature has chosen to make by charging one but not the other." Id., 532. The state argued that requiring acquittees to reimburse the state served the legitimate purpose of conserving state funds. Id., 531. The court, however, rejected this justification because excepting prisoners from the reimbursement requirement "whether or not they are able to pay such costs" was inconsistent with this purpose. Id. In the same way, taxing cigarette purchases by inmates in correctional institutions is unconstitutional if persons confined in other state institutions are exempted from the tax even though they may be able to afford it. The majority's attempts to distinguish this case are simply unpersuasive.

Accordingly, I dissent and would hold that section 28 is unconstitutional because it violates the equal protection clause of the United States constitution.[9]

---

[9] I therefore do not reach the plaintiff's due process claims.